Maurice FITZGERALD, Plaintiff,

v.

Raymond PROCUNIER, Individually and in his official capacity as Director of the California Department of Corrections, et al., Defendants.

No. C–74–1969–CBR.

United States District Court,
N. D. California.

April 23, 1976.

Susan Kaplan, San Francisco, Cal., for plaintiff.

Evelle J. Younger, Atty. Gen., Jack R. Winkler, Chief Asst. Atty. Gen., Edward P. O'Brien, Asst. Atty. Gen., Karl S. Mayer, Kenneth C. Young, Deputy Attys. Gen., San Francisco, Cal., for defendants.

## MEMORANDUM OF OPINION AND ORDER

RENFREW, District Judge.

Plaintiff, a prisoner in state custody at San Quentin State Prison, Tamal, California, originally brought this civil rights action under 42 U.S.C. § 1983 alleging that his rights under the Eighth and Fourteenth Amendments to the Constitution had been violated. In its Memorandum of Opinion and Order dated May 5, 1975,[1] this Court granted defendants' motion to dismiss as to members of the California Adult Authority and further granted defendants' motion for summary judgment with respect to all claims arising out of asserted deprivations of due process at plaintiff's June 21, 1974 prison disciplinary proceeding, plaintiff's claims of cruel and unusual punishment, and plaintiff's claim of alleged due process violations at the June 26, 1974 classification hearing. The motion for summary judgment was denied with respect to asserted violations of due process in plaintiff's continuation in administrative segregation. After further hearing, both plaintiff and defendants have moved for summary judgment on this remaining issue of asserted violations of due process in plaintiff's continuation in administrative segregation.

1. The Memorandum of Opinion is reported at 393 F.Supp. 335, D.C.Cal. and contains a more detailed statement of the facts in this case.

Plaintiff's administrative segregation arose out of an incident involving several racially motivated assaults on prisoners on June 2, 1974 on the third tier of the East Block Housing Unit at San Quentin. On June 3 plaintiff was placed in administrative segregation in the North Block Housing Unit. After examination by an investigating officer and appearances on June 14 and 21 before meetings of the disciplinary committee, plaintiff was found guilty of participating in these assaults. On June 26 the Full Classification Committee assigned plaintiff to administrative segregation "for further observation", to be reviewed after 120 days. It was found that plaintiff had been afforded due process in this initial classification. Memorandum of Opinion and Order dated May 5, 1975, at p. 8 (393 F.Supp. at 340).

Plaintiff's status was subsequently reviewed by either the Subclassification Committee or individual correctional officers on July 16, August 28, September 27, October 1, and December 24, 1974. However, plaintiff's status was not reviewed by the Full Classification Committee (or Institution Classification Committee, hereafter "Full Committee") until January 2, 1975, approximately 180 days after the initial classification, a period of time contrary to both the original decision of the Committee and to the Inmate Classification Manual of the Department of Corrections which specifies an interval of 120 days for this initial review by the Full Committee.[2]

On October 1, 1974, plaintiff had been approved for an institutional transfer due to reconstruction of San Quentin security housing. Due to a request from plaintiff's attorney that plaintiff's transfer be stayed until after a possible court appearance in this action, the transfer was delayed as an attorney accommodation until October 28, 1974. The transfer was subsequently rescinded when the closing of the inmate security housing section ("B" Section), in which plaintiff was housed, was delayed. The CDC–128–G report filed by the Full Committee when it reviewed plaintiff's status on January 2, 1975, read in pertinent part:

"Subject was denied transfer on the basis of pending court action. Committee could see no alternative to retaining subject in segregation with recommendation that case be reviewed again after completion of court action."

In reviewing the January 2, 1975 report, the Court noted that two possible interpretations could be made of this passage, both of which raised due process considerations. Memorandum of Opinion and Order dated May 5, 1975, at p. 10 (393 F.Supp. at 341). The first was that the Full Committee deferred reconsideration of plaintiff's segregated status pending the close of this action, a clear interference with plaintiff's right of access to the courts. *See Johnson v. Avery,* 393 U.S. 483, 485, 89 S.Ct. 747, 748, 21 L.Ed.2d 718, 721 (1969). The second was that the Full Committee failed to make an adequate record of its reasons for continuing segregation, such that would serve to inform plaintiff, the Adult Authority, future Classification Committees, prison officials, or other persons who might review plaintiff's conduct. *Cf. Wolff v. McDonnell,* 418 U.S. 539, 565, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935, 956 (1974).

The record in this case, now clarified by additional affidavits by prison officials and plaintiff as well as the CDC–128–G report filed by the Full Committee when it again reviewed plaintiff's status on May 14, 1975, establishes that the second interpretation of the January 2 report is correct. Transfer was the disposition favored by the Classification Committee, because it would give the inmate a "fresh start" and frequently "results in a more prompt release to the general population than would be the case if the inmate were retained in the institution where the se-

---

**2.** Inmate Classification Manual of the Department of Corrections paragraph 3, subparagraph B.

curity problem arose." Affidavit of D. R. Weber, Associate Warden in charge of operations; Affidavit of C. L. Swagerty, Associate Warden of Programs. Transfer was foreclosed, however, by the accommodation made at the request of the attorney for plaintiff. The only other alternative, a reduction of plaintiff's status within the San Quentin facility, was also foreclosed. The May 14, 1975 report supplements the January 2 report by stating that at the time of plaintiff's appearance before the Full Committee on January 2, San Quentin was experiencing a lock down following the racial killings of December 19, 1974, and that it had been decided that the institutional climate was not appropriate for a reduction of plaintiff's status. Hence, the explanation of the Committee that it "could see no alternative to retaining [plaintiff] in segregation with recommendation that the case be reviewed again after completion of court action" is reasonable. The Court does not find either an intentional or an unintentional interference with plaintiff's access to the courts.

 Two other aspects of the January 2, 1975 review nonetheless deeply concern the Court: the failure of the Full Committee to review plaintiff's status after 120 days as specified in the Inmate Classification Manual and the failure of the Full Committee to provide a reasonable explanation in the January 2 CDC–128–G report for plaintiff's continuation in segregated status. While every variance from prescribed prison operating procedures may not establish a violation of due process, nevertheless such variances are suspect in the absence of satisfactory explanations. Under these circumstances the Court must inquire whether the minimum requirements of procedural due process appropriate for the circumstances have been observed. *Wolff v. McDonnell, supra,* 418 U.S. at 559, 94 S.Ct. at 2976, 41 L.Ed.2d at 952. Prison officials have the

duty, even where fairness is afforded at the outset of the classification, to provide periodic review of an inmate's administrative segregation where the classification is indefinite in term. *Bowers v. Smith,* 353 F.Supp. 1339, 1346 (D.Vt. 1972).

 In analyzing the delay of the Full Committee to make a review of plaintiff's status, however, there are several mitigating factors to be taken into consideration. Plaintiff's 120-day review by the Full Committee would have fallen in the latter part of October, at a time when he was subject to transfer. The Subclassification Committee, which has the primary responsibility for determining the optimum time for release of inmates from security housing to the general prison population.[3] did review plaintiff on July 16, August 28, and December 24, 1974. Plaintiff was never without committee review for a period greater than 120 days during the period between the initial classification on June 26, 1974, and the initial Full Committee review on January 2, 1975. It was within the power of the Subclassification Committee to change plaintiff's status or to release him to the general prison population, although such a decision would have been subject to review and possible change by the Full Committee.[4] Plaintiff did not avail himself of the administrative appeal procedures that were open to him to contest the 60-day delay in review by the Full Committee. Where the delay in review may have been due to plaintiff's possible transfer and frequent review was made in the interim by the Subclassification Committee which had broad powers to effect a change in plaintiff's status, and plaintiff did not avail himself of the administrative appeal procedures that were available, the Court does not find a denial of due process. Furthermore, since plaintiff has been reduced to an intermediate status in an apparent step toward eventual release to the general prison popula-

---

**3.** Inmate Classification Manual, chapter 5, paragraph 4, subparagraph A.

**4.** Inmate Classification Manual, chapter 5, paragraph 4, subparagraph A.

tion, and it does not appear that there is a "reasonable expectation" that plaintiff will be returned there and retained without timely review by the Full Committee, this question is moot. *See Preiser v. Newkirk,* 422 U.S. 395, 402, 95 S.Ct. 2330, 2335, 45 L.Ed.2d 272, 278 (1975). The Court denies the relief sought by plaintiff of full release to the prison "mainline" or general population.

■ As noted above, the January 2, 1975 CDC–128–G report contains an incomplete statement of the reasons for which the Full Committee retained plaintiff in segregated status. Written records serve to protect an inmate from collateral consequences based on a misunderstanding of the nature of the original proceeding and insure that administrators, faced with scrutiny by state officials, the public, and even the courts, will act fairly. *Wolff v. McDonnell, supra,* 418 U.S. at 565, 94 S.Ct. at 2979, 41 L.Ed.2d at 956. However, to the extent that this report should be modified to adequately explain the reasoning of the Full Committee, such explanation has already been made in other CDC–128–G reports that have been filed. The Subclassification Committee report of December 24, 1974 and the Full Committee report of May 14, 1975 state that a pending court appearance had delayed plaintiff's transfer. The Full Committee report of May 14, 1975 also recounts the circumstances of the racial killings of December, 1974, which had led the Full Committee to decide in January that the institutional climate was not right for plaintiff's release, a decision that is well within the discretion of the Full Committee.[5] The content of the written reports in plaintiff's record satisfies the purposes outlined in *McDonnell,* and due process has not been violated. The Court declines to strike these reports from prison records as plaintiff seeks.

Accordingly, IT IS HEREBY ORDERED that plaintiff's motion for summary judgment is denied.

IT IS HEREBY FURTHER ORDERED that defendants' motion for summary judgment is granted.

IT IS HEREBY FURTHER ORDERED that counsel for defendants shall promptly prepare a form of judgment in accordance with this Memorandum of Opinion and Order.

---

**5.** Inmate Classification Manual, Chapter 5, paragraph 1, subparagraph E(4).