**Jaan K. LAAMAN, Raymond Martineau and Edward McMillan,**

v.

**Everett I. PERRIN, Warden, New Hampshire State Prison and Board of Trustees for the New Hampshire State Prison.**

**Civ. A. No. 77–187.**

United States District Court,
D. New Hampshire.

Aug. 11, 1977.

Arpiar G. Saunders, Jr., and Richard A. Cohen, New Hampshire Legal Assistance, Concord, N. H., for plaintiff.

James S. Sargent, Jr., Concord, N. H., for defendants.

## OPINION AND ORDER

BOWNES, District Judge.

In this civil rights action, the court must balance two important but competing interests. Plaintiff Laaman, an active, successful and politically motivated writ writer at the New Hampshire State Prison (NHSP) has been ordered transferred into the federal prison system by defendants. The written and verbalized justifications for the transfer are reasonable, rational and within the scope of the prison officials' discretion. However, plaintiff claims that the real underlying motivation for his transfer is to rid the prison of its most active, vocal and successful writ writer, that his transfer contravenes his right of access to the courts, and that it will severely inhibit not only his exercise of the access right but the exercise of it by the class of persons he has represented in past law suits against the prison. Plaintiff also alleges that he is entitled to a transfer hearing which comports with the due process requirements of the Fourteenth Amendment. This action is brought pursuant to 42 U.S.C. § 1983 with jurisdiction conferred by 28 U.S.C. § 1343(3) & (4). Defendants are the Governor of the State, the Warden of NHSP, and the Board of Trustees of NHSP. The Warden and the Governor are sued in their official and individual capacities.

■ This court has heard evidence solely on the right of access issue and, therefore, at this time will determine only whether or not plaintiff's due process claim states a cause of action. Under state law, plaintiff must serve his sentence of more than one year in the state prison. NH RSA 651:15. Under NH RSA 623:2

> [a]ny person who is confined in the state prison, may upon recommendation of the warden, and with the approval of the governor, . . . be transferred to a city jail or house of correction.

New Hampshire is a member of the New England interstate corrections compact under which inmates may be transferred for confinement, treatment and rehabilitation under contract to the penitentiaries of other subscribing states. NH RSA ch. 622-A. The warden is specifically empowered to utilize the New England compact. NH RSA 622-A:3. While there are no specific statutory authorizations for federal transfers of New Hampshire prisoners, I cannot find that New Hampshire law guarantees that a New Hampshire convict will serve his time in any particular institution or even inside the state. Therefore, an out-of-state transfer as such does not implicate the Due Process Clause of the Fourteenth Amendment. *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Curry-Bey v. Jackson,* 422 F.Supp. 926 (D.D.C. 1976).

■ Plaintiff also claims that, because defendants voluntarily granted him a transfer hearing, they obligated themselves to conduct such hearing in accord with the due process requirements of the Fourteenth Amendment. I rule that plaintiff was not entitled to a constitutionally sufficient hearing on the question of whether or not he should be transferred to the federal prison system simply because defendants voluntarily granted him some process. *See Fano, supra,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451; *Four Certain Unnamed Inmates of Mass. v. Hall,* 550 F.2d 1291 (1st Cir. 1977); *Lombardo v. Meachum,* 548 F.2d 13 (1st Cir. 1976); *Curry-Bey, supra,* 422 F.Supp. 926. Plaintiff's due process claim is dismissed for failure to state a cause of action.

## THE ACCESS ISSUE

### THE FACTS

Plaintiff Laaman is serving sentences in the New Hampshire State Prison (NHSP) for unsuccessfully bombing a Manchester

police station. The crime for which he is serving time is generally abhorred by the prison staff, as are his political views. He is a self-avowed political radical and activist who has not kept a low profile at the prison. Early in his sentence, Laaman exhibited disruptive political leadership as is evidenced by his disciplinary record. He was committed to NHSP in June, 1972, and, since then, has been found guilty of fourteen disciplinary infractions. The first five of these were in the first eighteen months of his sentence and were politically motivated. Another eight were received between March, 1975, and January, 1976, five of which were received during the pendency of a major court action and were found by this court to constitute legal harassment. *See Laaman v. Helgemoe*, C. 75–258, 437 F.Supp. 269 (D.N.H. 7/1/77). He has never been convicted of a major disciplinary infraction and has never been accused, either formally or informally, of any violence towards inmates or guards inside the prison. He was convicted in a court of law of participating in a riot, after he had been acquitted of the same charge at a major prison disciplinary hearing. He has served as an elected inmate representative since 1973 when he helped establish a formal grievance procedure, and has continuously acted informally as a spokesperson and mediator for other prisoners. He has been an officer in the New England Prisoners' Association and has attempted to establish a prisonwide newspaper at NHSP.

Plaintiff Laaman is an able, prolific and often successful jailhouse lawyer. He has sued NHSP as a named plaintiff seven times in this court.[1] In one of those cases, he established his right to due process in an interprison transfer hearing. *Hoitt v. Vitek*, 361 F.Supp. 1238 (D.N.H.1973), aff'd, 497 F.2d 598 (1st Cir. 1974). He is the named plaintiff in the most comprehensive law suit ever brought against the prison. *Laaman v. Helgemoe, supra,* C. 75–258, 437 F.Supp. 269. While this court has no spe-

cific records of his general lawyering and counselling activities, I am well aware of Laaman's role as a prison writ writer. *See Moses v. Helgemoe*, C. 76–225; *Vayens v. Helgemoe*, C. 75–93. There is no doubt that he has been involved in dozens of cases, some of which have effectively curtailed the discretion of defendants and some of which will cost the prison substantial amounts of money. He also runs legal clinics for the prisoners.

Laaman is popular among the inmates and evidences genuine concern for them. In addition to his legal activities, he writes personal letters for the semi-literates, speaks on behalf of men who can't talk, and demands the things he feels are right and needed. He is disliked by the staff. He is seen as a leader in the inmate culture, and as a rude, demanding, vociferous rebel. Their attitude stems from their dislike of his crime and his continuing leadership activities as well as their feelings that he has been an instigator of some of the violence that takes place at the prison.

In February, 1977, Laaman was elected to the Inmate Communications Committee (ICC), the officially sanctioned inmate grievance committee. The ICC brought general and individual problems to the attention of the prison administration. Inmates on the ICC experienced frustration in their jobs and some harassment from being "up front" over a period of time. The committee is now defunct with each side blaming the other for its demise. There is no general prison grievance procedure at NHSP at the present time.

During his term as an ICC member, Laaman witnessed the transition from one warden to another. Defendant Perrin arrived at NHSP in January and assumed the warden's responsibilities as Acting Warden in April. Between March and the middle of May, the ICC met with Perrin almost daily to iron out their differences concerning prison policies and practices as to visits,

---

1. *Laaman v. Hancock*, 351 F.Supp. 1265 (D.N.H.1972); *Laaman v. Vitek*, C. 72–250, C. 73–16; *Hoitt v. Vitek*, 361 F.Supp. 1238 (D.N.H.1973), aff'd, 497 F.2d 598 (1st Cir. 1974); *Laaman v. Fuller*, C. 74–227; *Laaman v. Helgemoe*, C. 75–258, 437 F.Supp. 269 (D.N.H.1977); *Laaman v. Morrison*, C. 76–298.

mail, yard time, coffee, the new minimum security house, etc. They had a good and fruitful working relationship.

In mid-May two groups of inmates independently escaped from the prison. After each escape, there was a brief lockup and a search of the prison including each prisoner's cell. After the second lockup on May 23, Perrin instituted several policy changes without consultation with the ICC. Some of the changes concerned visitation policies and disturbed all prisoners; others were of more direct concern to the ICC. The ICC was prohibited from going into the annex cell block without a specific prisoner request for their services, and the doors from the main cell block to the administrative section of the prison were locked for the first time, preventing free access by the ICC to the administration. These changes were the result of annex prisoner complaints and efforts on the part of the administration to tighten security.

The changes, and especially some new visitation policies, upset the inmates, and tension was high at the prison. There was much talk of trouble over the Memorial Day weekend, but it passed uneventfully. The ICC met with Perrin on May 30 and demanded recision of the new policies. Some accommodations were made to the prisoners' demands when it became apparent that there was insufficient staff to enforce the new rules, but the prisoners were dissatisfied. On Tuesday, May 31, McMillan, a member of the ICC and a recognized inmate leader, called a meeting of the general prison population. At 1:30 P.M., he and several others were locked into their cells, pursuant to a policy of the staff to lock in men who had material blocking their cell doors or windows. Neither McMillan nor the other inmates were told why they were locked in. McMillan specifically was locked in by a guard with whom he had a standing feud. When advised of the situation and of the general meeting by the remaining members of the ICC, Perrin, ignorant of his staff's practice, was evasive and told Laaman that he could run the meeting.

Laaman conducted the general meeting after working hours. He told the prisoners about the stalled communications with defendant Perrin and asked for instructions on how to proceed. The inmates told him not to meet any longer until certain policies were rescinded. The tone of the meeting was angry. As a result of the meeting, the ICC decided to write defendant Perrin a letter outlining its specific grievances. At the head of the list was the summary lockup treatment of McMillan and other inmates.

On June 1 there were six minor fires in the prison, the first in the Plate Shop and the second in the cell of the inmate who reported the Plate Shop fire. Inmates began to stockpile food, and the prison was rife with rumors of big trouble, specifically that the prison Industries Building would be burned. The ICC met early that day with Perrin, and McMillan was released a little later without removing any material from his cell window or door. The ICC met again with Perrin and the head of custody late in the afternoon to find out whether or not a lockup was contemplated by the administration after the minor fires. The tone of the meeting was belligerent with the ICC members demanding return to pre-Perrin policies and reflecting the threatening mood of the prison. They were told that there would not be a lockup.

On either June 1 or June 2, inmate Lemire's set of drums was removed by the prisoners from the Industries Building. While the exact timing of this event is not important, its significance should not be underestimated. The drums were very expensive and part of the Die Hard Motorcycle Club's band equipment.[2] All concerned at the prison knew that no building would be burned so long as it held the Die Hard's instruments. The removal of the drums was a clear signal to the administration of the imminent seriousness of the rumors that they were hearing. It is also impor-

2. I take judicial notice of the fact that the administration believes that the Die Hards wield considerable influence with the inmates.

tant to note that Laaman and McMillan were among the ten to twelve inmates who helped to move the musical equipment out of the Industries Building.

The atmosphere on June 2 was volatile. Perrin was convinced that the ICC, and McMillan in particular, was doing all it could to stir things up. In a last ditch effort to avoid a lockup, Perrin decided to confront the ICC. He met with them a little after noon, told them that they were responsible for the troubles at the prison and specifically accused McMillan, saying that he could charge him with conspiracy in one of the recent escapes. Irate, McMillan shouted back, shook his finger in Perrin's face and abruptly left. The others followed suit. Perrin quickly decided that he could no longer guarantee the safety of the Industries Building and at approximately 1:30 P.M. instituted a lockup of the prison. That afternoon, he received a phone call from a woman who had visited the prison on May 31. She related that she had overheard some inmates, who remain unidentified, excitedly discussing burning the Industries Building to the ground. Plaintiffs Laaman and McMillan were among the twenty-five inmates receiving visits at that time.

Late June 2, pursuant to an overall security plan, Perrin asked four senior members of his custodial staff to list candidates for maximum security classification and for transfer to the federal prison system. The four men worked together going over the inmate population, deciding whether or not each prisoner posed a problem or a threat to security. They went through the inmates' files and considered their personal feelings, their day-to-day interactions and the inmates' attitudes in making their decisions. They then double checked their list by asking another officer to list five candidates for federal transfer. The two lists were identical, and Laaman was named on each one. Laaman was cited for:

> Convicted of inciting a riot in 1975. He has also been observed and connected with known instigators and is suspected to have shared in certain events designed

to undermine the administration of the prison. Ex. 13.

The list was submitted to Perrin early on June 3. He pursued the matter of the transfers with the prison Board of Trustees and received their approval. He also outlined other plans he had for wresting control of the prison from the inmate leaders to the administration. The Board of Trustees told Perrin of some extant emergency transfer procedures and advised him to update and follow them. That afternoon, Lieutenant Ash, the investigating officer at the prison, was given the list with instructions from Perrin to gather any evidence he could find of destructive conduct on the part of the five suggested inmates. Lieutenant Ash talked with the custodial officers who had drafted the list and discovered that they had little or no specific evidence about the charges they had raised against plaintiff Laaman and two other nominees. Ash reported to Perrin over the weekend that there was little or no evidence to show that Laaman had made any threatening gestures or demands and that the recommendation for Laaman's transfer was based only on the officers' feelings that Laaman posed a risk to the institution.

Up to this point, defendant Perrin had not focused on Laaman as a key troublemaker, and he testified that he had been surprised at his staff's recommendation. He knew that the prison was controlled by a few inmates working together, and throughout his testimony, Perrin referred only to McMillan as a ringleader. He had information from many sources that McMillan had made specific comments to the staff members concerning fire hazards, had threatened officers, smashed a TV and was generally stirring up the prison population. Perrin barely mentioned Laaman except to imply that Laaman was McMillan's second. He testified that, before his staff's recommendation, he had not connected Laaman with the prison leadership. Ash's initial report to him confirmed these feelings.

Later in the weekend, a detective from the State Police told Ash that Laaman had been connected by an informant with the

planning of a fire on March 25 at the prison Laundry. Although this information had been gathered soon after the fire, no one in the new prison administration knew of it until this time. It came as a surprise to Perrin and changed his opinion of plaintiff. After speaking at length with the detective, Perrin decided to recommend Laaman's transfer and ordered his removal from the prison to a county jail on Tuesday, June 7. The decision was based upon his respect for his staff's recommendation, Laaman's crime and disciplinary record, his alleged connection with the March 25 fire, and the June 2 phone call concerning the visiting room conversation.

At this point, it is to be noted that throughout this period Perrin had been in close contact with the Governor's office. The decision to lock up the prison on June 2 was made after he informed the Governor that he could no longer guarantee the safety of the Industries Building. Perrin was officially the Deputy Warden and the Acting Warden for the prison and was the prime candidate for the position of Warden. He was confirmed as Warden on June 8.

After being removed from the prison, Laaman received notice that his transfer into the federal prison system was being contemplated for the following reasons:

Intelligence information of association with recent fire.

Past conviction of Inciting a Riot.

Threatening gestures and demands as part of the inmate leadership. Ex. 6.

The notice was signed by Acting Deputy Warden Jamieson. While it is unclear exactly who drew up the charges, the testimony is that neither Jamieson nor Perrin did. It is also clear that the threatening gestures charge was unsubstantiated and was dropped at the hearing. Laaman was advised that a hearing would be held and that he would have certain procedural rights.

Following Laaman's removal from the prison, the contents of his cell were invento-

ried. During the search, a two inch piece of pipe, two metal pipe caps, and two .22 caliber crimped cartridges were found in his cell. The two inch pipe had a small hole drilled into it. The officers quickly decided that what they had discovered were the makings of a pipe bomb. The items were shown to Perrin who then concluded that his decision to recommend Laaman's transfer was fully justified, although he testified that he would have proceeded with it without the contraband. It must be noted that Laaman's cell had been searched twice within the previous month and, even though Laaman had had the large piece of pipe for six months, he was not cited for possession of contraband.

The hearing was held Saturday, June 11, from 9:30 P.M. until the early hours of June 12. Although Laaman received no notice of it, the contraband was introduced as evidence against him. At the hearing, he was advised that the "recent fire" was, in fact, the March 25 fire, and he was accused of participating in the May 31 visiting room conversation overheard by the anonymous telephone caller. He denied that the metal caps were his, said that he had permission to have the large piece of pipe in his cell, and admitted that his possession of the explosives was a serious infraction. He explained both to the Board and this court that the pipe was a part of the hanging apparatus for a punching bag. The Board did not accept this explanation nor does this court, particularly in the light of the failure of the guard named by Laaman to substantiate his claim. Stip. ¶ 9, 8/4/77.[3] He denied any participation in the March 25 fire and pointed out that he had never been charged with or disciplined for it, and that neither of the two inmates suspected of actually committing the arson are recommended for transfer. Laaman also denied participating in the May 31 visiting room conversation. Laaman cited to the Board his political, legal, and leadership activities, and his consequent exposure as reasons for

---

**3.** Both at the hearing before the Board and in court, Laaman stated that Sergeant Rice would substantiate his explanation as to the pipe. The stipulation was submitted by counsel after the court informed counsel that it was of the opinion that either Sergeant Rice should testify or a stipulation be submitted.

his disciplinary reports and pointed out that the riot conviction has not been held against seven of the nine inmates so convicted, all of whom have been either paroled or trustied.

Citing the possession of the potentially dangerous contraband, which Laaman admitted, the information connecting Laaman to the March 25 fire and his records which "reflect a strong rejection of authority and habitual disruptive behavior," the Board recommended his transfer so that he could "benefit from the programs which a larger and better funded institution would have to offer." Ex. 14 at 3. The Appeals Board affirmed, and Laaman sought relief in this court.

### THE LAW

The right of access to the courts is one of the few rights that has survived intact during the recent retreat from federal judicial interference in certain areas of prison administration. *See, e. g., Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Wolff v. McDonnell,* 418 U.S. 539, 577–80, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Procunier v. Martinez,* 416 U.S. 396, 419–22, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). The right of access has its roots in the First and Fourteenth Amendments to the United States Constitution. *See California Transport v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *McDonnell, supra,* 418 U.S. at 579, 94 S.Ct. 2963 and "assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." *McDonnell, supra,* 418 U.S. at 579, 94 S.Ct. at 2986. Its importance to the incarcerated lies in the fact that "the prisoner petitions . . . are the first line of defense against constitutional violations," *Bounds, supra,* 430 U.S. at 828, 97 S.Ct. at 1498, whether the violations occurred in the process of arrest, trial or sentencing or whether they are violations which involve conditions of confinement.

■ The right of access to the courts imposes two separate types of duties upon prison officials: first, they may not abridge, impair or burden the exercise of the right, *see, e. g., McDonnell, supra,* 418 U.S. at 577–80, 94 S.Ct. 2963; *Johnson, supra,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718; *Ex Parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941); and, second, they must "shoulder affirmative obligations to assure all prisoners meaningful access to the courts." *Bounds, supra,* 430 U.S. at 824, 97 S.Ct. at 1496. The access right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds, supra,* 430 U.S. at 828, 97 S.Ct. at 1498.

■ The right of access to the courts clearly encompasses the right to seek judicial resolution of grievances without punitive reactions on the part of prison officials.

Disciplining inmates for pursuing legal remedies to redress alleged abuses of their rights, either by direct deprivation of privileges or by a denial of potentially available privileges, can similarly severely discourage them from effectively and appropriately utilizing the courts. . . . Classification decisions, be it for parole or for work release in the correctional system, should not be affected by an individual's efforts to petition the courts for a redress of grievances. *Moore v. Howard,* 410 F.Supp. 1079, 1080 (E.D.Va.1976).

*Accord, e. g., Haymes v. Montanye,* 547 F.2d 188 (2d Cir. 1976), *cert. den.,* —— U.S. ——, 97 S.Ct. 2925, 53 L.Ed.2d 1063 (1977); *Navarette v. Enomoto,* 536 F.2d 277, 280 (9th Cir. 1976), *cert. granted on other grounds,* 429 U.S. 1060, 97 S.Ct. 783, 50 L.Ed.2d 776 (1977); *Hooks v. Kelley,* 463 F.2d 1210 (5th Cir. 1972); *Martinez v. Oswald,* 425 F.Supp. 112 (W.D.N.Y.1977); *Thompson v. Bond,* 421 F.Supp. 878 (W.D. Mo.1976); *Fitzgerald v. Procunier,* 410 F.Supp. 1186, 1188 (N.D.Cal.1976); *Morris v. United States,* 399 F.Supp. 720 (E.D.Va. 1975); *Smith v. State of North Carolina,* 355 F.Supp. 217 (W.D.N.C.1973), *aff'd,* 528 F.2d 807 (4th Cir. 1975).

The Supreme Court cases concerning the right of access to the courts have placed a heavy burden on prison administrators to justify any impairment of the right. If a reasonable alternative method of achieving the administration's goal exists, it must be used. *McDonnell, supra,* 418 U.S. at 580, 94 S.Ct. 2963; *Johnson, supra,* 393 U.S. at 489, 89 S.Ct. 747. While the significant disciplinary problems possible in a situation where inmates provide legal assistance to other inmates have been recognized, they constitute no justification for a ban on jailhouse lawyering. *Bounds, supra,* 430 U.S. at 831–832, 97 S.Ct. at 1500; *Martinez, supra,* 416 U.S. at 421–22, 94 S.Ct. 1800; *Johnson, supra,* 393 U.S. at 488, 89 S.Ct. 747. It is apparent that the right of access to the courts triggers a high standard of review once it is determined that a prison administration has, by regulation, practice or a single act, diminished the availability of a judicial forum to hear a prisoner's grievance.

Competing with this fundamental right is the far reaching discretion afforded prison administrators in their Sisyphean task of maintaining security and order in the prison. In the face of a First Amendment attack on a prison's regulations concerning a prisoners' labor union, the Supreme Court ruled that

> [r]esponsible prison officials must be permitted to take reasonable steps to forestall . . . a threat [of violent confrontation and conflagration], and they must be permitted to act before the time when they can compile a dossier on the eve of a riot. *Jones v. North Carolina Prisoners' Union,* —— U.S. ——, at ——, 97 S.Ct. 2532, at 2542, 53 L.Ed.2d 629 (1977).

So long as the regulations are reasonable and plaintiffs do not prove defendants "conclusively . . . wrong" in their views, infringements upon prisoners' associational rights will be tolerated. *Jones, supra,* —— U.S. at —— – ——, 97 S.Ct. at 2541–2542.

This same discretion is afforded prison administrators in their decisions to transfer prisoners from one institution to another within the state so long as state law does not create in a prisoner a justifiable expectation to be confined in any particular institution. *Fano, supra,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451; *Haymes, supra,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466. *Cf. Moody v. Daggett,* 429 U.S. 78, 88 n.9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1977). However, the rulings of *Fano* and *Haymes* are limited in one aspect important to this case; they hold only that

> [a]s long as the conditions or degree of confinement to which the prisoner is subjected are within the sentence imposed upon him *and are not otherwise violative of the Constitution,* the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight. *Haymes, supra,* 427 U.S. at 242, 96 S.Ct. 2543. (Emphasis added.)

*Accord, Fano, supra,* 427 U.S. at 224, 96 S.Ct. at 2538.

After the Court decided *Fano* and *Haymes,* it reemphasized and expanded the right of access to the courts in *Bounds.* Therefore, I must conclude that the discretion afforded prison administrators in transfer decisions does not swallow the inmate's fundamental right of access to the courts. Otherwise, prison administrators would be free to accomplish exactly what plaintiff alleges here, the transfer of successful and, therefore, troublesome litigants for no reason other than their legal activities.

I conclude that the clearly erroneous standard applied in *Jones* in the face of regulations which "barely implicated" First Amendment rights should not be applied in actions which allege infringements upon the right most important to incarcerated persons. *Jones, supra,* —— U.S. at ——, 97 S.Ct. at 2540.[4] Without access to the

---

4. This conclusion is bolstered by the Court's implied concern with the access right in its discussion of the First Amendment rights involved in *Jones.* "The State has not ham-

courts, substantive rights would be afforded only at the discretion of prison authorities which could render the Constitution meaningless to those behind bars.

[E]very prisoner has a constitutional right of access to the courts to present any complaints he might have concerning his confinement. He cannot be disciplined in any manner for making a reasonable attempt to exercise that right. Access to the courts is a fundamental precept of our system of government. No citizen, regardless of his transgressions, is ever to be legally consigned to the total and unreviewed power of any single branch of government. To make the system work, to maintain the proper checks and the proper balance, no person subject to the power of government can be denied communication with or access to each of the three spheres of governmental authority. This principle serves the highest interest of government as much as it serves the needs of the individual. *Andrade v. Hauck,* 452 F.2d 1071, 1072 (5th Cir. 1971).

 Clearly, the initial burden of proof lies on the plaintiff to establish this suit as a right of access case. Until "substantial evidence" demonstrates that "the officials have exaggerated their response to [legitimate] considerations . . .," *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974), this court must presume that an administrative transfer is made for legitimate penological concerns. *See Jones, supra,* —— U.S. at ——, 97 S.Ct. at 2539. Plaintiff must establish by substantial evidence that the real motivating factor for his transfer, whether conscious or unconscious, was his writ writing activities and that the security risks defendants cite are, in fact, exaggerated responses. It is not necessary that plaintiff establish that defendants actually intended to violate his constitutional rights, but only that their acts have that effect. *Roselli v. Noel,* 414 F.Supp. 417 (D.R.I.1976). Plaintiff's burden is not a small one. In the prison context, the substantial evidence rule

means that plaintiff must overcome the strongly sanctioned reluctance of federal courts to intervene in the internal affairs of prisons and the appropriate deference we must afford prison administrators trained and skilled in the difficulties of prison management. So long as there is an unrebutted, rational and nondiscriminatory basis for defendants' acts, they are not exaggerated responses. *See Jones, supra,* —— U.S. at ——, 97 S.Ct. at 2539. And only substantial evidence will serve to rebut the presumption that the decision of a prison administrator is both legitimate and reasonable.

 If plaintiff meets his burden, defendants must then justify their abridgment of his fundamental constitutional right by establishing a substantial legitimate need for the transfer which outweighs the chilling effect it will have on plaintiff's First and Fourteenth Amendment right. *Thompson v. Bond, supra,* 421 F.Supp. 878. *See Johnson, supra,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718; *Haymes v. Montanye, supra,* 2 Cir., 547 F.2d 188. *Cf. Bounds, supra,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72. Defendants must also establish that no other reasonable alternative to transfer exists by which they could achieve their substantial governmental interest. *McDonnell, supra,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935; *Johnson, supra,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718.

## CONCLUSION

 Based on the foregoing facts and the inferences I draw from them, I conclude that plaintiff Laaman has adduced substantial evidence that establishes that the initial motivating factor for his transfer was his political-legal activities and that the security risks defendants initially cited as the basis for the transfer were exaggerated responses. Laaman's original crime and his early overt political activities drew attention and punishment to him. His political expressions, his desire for a leadership role in the prison and his sympathy for his fel-

pered the ability of prison inmates to communicate their grievances to correctional officials." *Jones,* —— U.S. at ——, 97 S.Ct. at 2540.

low inmates drew him into frequent conflict with various prison administrations. Instead of violence and force, Laaman usually resorted to the courts where he sought relief not only for himself but for the whole prison population. His legal activities have brought some changes to NHSP which are not welcomed by all members of the prison administration. But, according to one staff member, Laaman has achieved through litigation what the prison administration has failed to accomplish in the Legislature.

The staff recommendation for Laaman's transfer was based on their feelings that Laaman's presence disrupted the prison community. I find that this disruption stemmed from Laaman's protected activities as a sanctioned leader and as a writ writer. A comparison of the charges leveled against Laaman with the charges raised against the forty inmates suggested for maximum security leaves no doubt that the recommendation for his transfer was based on a dislike for and mistrust of an inmate who had successfully asserted a liberal penal philosophy in both the prison and the courts. His work record was good to excellent; his recent disciplinary problems were minor and few; he had never been accused of any violence in the prison and even Warden Perrin stated that he did not associate Laaman with the prison leadership until told of Laaman's suspected association with the March 25 fire. The officers were unable to substantiate their feelings concerning Laaman with any specific facts. The riot convictions of seven of the nine inmates have not prevented their release on parole or appointment as trusties, both of which are awarded for good conduct. To hold Laaman's conviction against him without more is discriminatory.

The staff's recommendation weighed heavily with Perrin, the Hearing Board, and the Appeals Board and tainted all those procedures. However, other reasons for Laaman's transfer emerged after the initial recommendation. The contraband found in plaintiff's cell and the information connecting him with a fire at the prison vindicate the staff's feelings concerning Laaman and constitute a substantial basis for an inter-prison transfer. Laaman has failed to rebut this evidence against him, and, clearly, his writ writing activities must not shackle defendants' hands. He cannot be immunized from transfer solely because he is a prolific and accomplished jailhouse lawyer. Given Laaman's background, the explosives and pipe in his cell, his leadership activities, and the information associating him with a major fire at NHSP, this court must conclude that defendants have established a substantial need to remove him from the prison at this time. Because it is Laaman's underground leadership that defendants are seeking to deter, they can only achieve their purpose by a transfer.

Therefore, I hold that, despite the fact that plaintiff Laaman's transfer is partly sought because of his writ writing activities, defendants have established a substantial legitimate need for his removal from NHSP. Plaintiff's request for injunctive relief is accordingly denied. Laaman will, of course, have to be returned to New Hampshire whenever his presence is required in any case to which he is a party.

SO ORDERED.