Gerard J. BEAN, Jr.

v.

Michael J. CUNNINGHAM, Warden, New Hampshire State Prison; C.O. Holland; C.O. Grimaldi; C.O. Anderson, as Correctional Officers of New Hampshire State Prison; C.O. Lawson, as Property Officer of New Hampshire State Prison and Disciplinary Board Chairman of 6/7/85.

Civ. No. 85–444–D.

United States District Court, D. New Hampshire.

Dec. 24, 1986.

Gerard J. Bean, Jr., pro se.

Peter T. Foley, Asst. Atty. Gen., State of N.H., Concord, N.H., for defendants.

## MEMORANDUM OPINION

DEVINE, Chief Judge.

This is a pro se civil rights action brought pursuant to 42 U.S.C. § 1983,[1] wherein plaintiff Gerard Bean, an inmate at New Hampshire State Prison ("NHSP"), seeks money damages and declaratory and injunctive relief.[2] As gleaned from the multitudinous pleadings and evidence presented at trial, plaintiff here raises four complaints of deprivation of his civil rights in connection with his transfer from medium to maximum security housing within NHSP. Plaintiff's contentions are: (1) that excessive force was used against him during a prison altercation which occurred while he was being transferred between cellblocks, such force constituting cruel and inhuman punishment proscribed by the Eighth Amendment to the United States Constitution;[3] (2) that he was given inadequate medical treatment after said altercation, violating his Eighth Amendment right to be free from unnecessary and wanton infliction of pain; (3) that a negligent loss of his property during a property transfer deprived him of his property without due process of law in violation of the Fourteenth Amendment;[4] and (4) that the deliberate withholding of approximately eight of his legal books violated his Fourteenth Amendment right to due process by improperly restricting his access to the courts.

During a two-day bench trial, the Court heard testimony from NHSP Warden Cunningham; six correctional officers who par-

---

1. 42 U.S.C. 1983 provides in relevant part:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2. Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343.

3. The Eighth Amendment provides that "cruel and unusual punishments [shall not be] inflicted." U.S. Const. amend. VIII.

4. The Fourteenth Amendment provides in pertinent part (the Due Process clause): "[N]or shall any State deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1.

ticipated in or witnessed the altercation in which plaintiff alleges the use of excessive force; five medical personnel who examined or treated plaintiff before or after the altercation; the NHSP investigator who conducted the post-incident investigation; the NHSP Property Officer responsible for the care and transfer of plaintiff's property at times incident to his transfer; a NHSP inmate who witnessed the altercation from an adjoining room; a friend of plaintiff who visited him several days after the altercation; and plaintiff. The events giving rise to this litigation are summarized as follows.

On May 29, 1985, at approximately 5:30 p.m., plaintiff was ordered to be transferred from the NHSP medium security cellblock to the Special Housing Unit ("SHU"), NHSP's maximum security facility. Effecting the transfer, Correctional Officer Alan Northcott accompanied plaintiff from the medium security area to the sallyport, a vestibule and sort of admitting area located adjacent to the main control room and entrance to SHU. Plaintiff was not handcuffed and was carrying a box containing an unspecified number of his legal files. Upon arrival at the sallyport, plaintiff and Northcott were met by Correctional Officer Alan Grimaldi. Grimaldi was to accompany plaintiff from the sallyport to the SHU cellblock. Pursuant to NHSP regulations regarding transfer of inmates to SHU, Grimaldi ordered plaintiff to put his hands behind his back and submit to being handcuffed. Plaintiff balked, unhappy at the prospect of being unable to carry his box of files if handcuffed. Grimaldi became insistent. Words escalated into physical action, push came to shove, and an altercation ensued. Grimaldi and Northcott, joined by two other Correctional Officers, grappled with plaintiff, at first standing, then rolling on the floor as the four officers tried to subdue plaintiff.

Following his subjugation and handcuffing, plaintiff's transfer to SHU was completed. Upon his arrival at SHU he complained of pain in his shoulder and claimed that he had a dislocated left shoulder and broken rib. After approximately ten to fifteen minutes, plaintiff's handcuffs were removed and he entered the SHU cellblock area. Approximately twenty minutes later, plaintiff was seen by Physician's Assistant George Carlucci, who observed that plaintiff's responses to Carlucci's examination were inconsistent with a dislocated shoulder. Plaintiff was also examined shortly thereafter by NHSP Corrections Nurse Jayne Smith who determined that emergency treatment was not necessary. X-rays were taken of plaintiff the following day, May 30, 1985, but were determined negative. On June 5 and June 19, 1985, plaintiff was examined by Dr. Edythe Craig, a medical doctor employed by NHSP. On June 27, 1985, at the request of Dr. Craig, plaintiff was examined by Dr. Leo Klinger, a medical doctor employed by NHSP as an outside consultant.

In the course of plaintiff's transfer, the NHSP property office assumed custody of a number of plaintiff's legal and personal papers, including the box plaintiff was carrying when he entered the sallyport on May 29, 1985. Pursuant to NHSP regulations, NHSP Property Officer Kenneth Lawson transferred that part of plaintiff's property which was unauthorized at SHU (including several law books) to Janet Roux, a friend of plaintiff living in the area. Plaintiff alleges that two folders of legal papers were lost during this transfer process.

On May 30, 1985, the day following the altercation, plaintiff met with NHSP Senior Prison Investigator Sydney Carlson. Utilizing a question and answer format, Carlson took a statement from plaintiff relating plaintiff's version of the events surrounding the sallyport incident, after which plaintiff signed the statement.

*The Eighth Amendment Use of Unnecessary Force Claim*

■ Plaintiff claims that the methods and amount of force used against him by prison correctional officers during and after the May 29 sallyport incident violate his Eighth Amendment right to be free from cruel and unusual punishment.

The Eighth Amendment prohibition of cruel and unusual punishment is limited in the context of conditions of incarceration to prevent only such conditions as "involve the wanton and unnecessary infliction of pain," are "grossly disproportionate to the severity of the crime warranting imprisonment," or "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981); *Santana v. Collazo,* 714 F.2d 1172, 1179 (1st Cir.1983), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984). Regarding inmate disturbances, the Supreme Court recently held:

> Where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' ...
> '[S]uch factors as the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted,' ... are relevant to that ultimate determination. From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is

tantamount to a knowing willingness that it occur.

*Whitley v. Albers,* —— U.S. ——, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). Applying the *Whitley* standard to the evidence presented in the instant case, the Court finds that plaintiff has not shown by a preponderance of the evidence that the force applied against him was anything more than a good faith effort to restore discipline in a disruptive and threatening situation.

Plaintiff's testimony at trial as to the brutal treatment he received at the sallyport is implicitly contradicted by the statement he gave to Investigator Carlson on May 30, the morning following the incident.[5] In this statement, plaintiff made no mention of brutality by the guards, stated he had only been struck once, and characterized the altercation as a "tussel [sic]" which consisted mostly of the participants "rolling around on the floor." Statement of Gerard Bean at 2–3 (May 30, 1985) (Defendants' Exhibit B). Plaintiff's version of events is supported by the testimony of Louis Burrell, a fellow inmate who, according to his testimony, watched the altercation while peering through a plate glass window at the top of a steel door to the sallyport. However, the credibility of Burrell's testimony is weakened by the fact that he never filed a complaint or report regarding the incident, and by his testimo-

---

**5.** Referring to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), plaintiff seeks to have the Court suppress the contents of this statement on the basis that Carlson failed to advise plaintiff of his *"Miranda"* rights before taking the statement. Plaintiff's Motion to Suppress at 4 (filed Sept. 12, 1986).

Plaintiff miscomprehends the applicability of *Miranda* to the use of his prior statement. The rule of *Miranda*—the extension of the Fifth Amendment privilege against compulsory self-incrimination to individuals subjected to custodial investigation by the police, *Miranda, supra,* 384 U.S. at 460–61, 86 S.Ct. at 1620—applies to statements used in subsequent *criminal* prosecutions, not subsequent *civil* lawsuits. *See* U.S.

Const. amend. V ("nor shall be compelled in any *criminal* case to be a witness against himself") (emphasis added); *Baxter v. Palmigiano,* 425 U.S. 308, 316–17, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976); *id.* at 335 & n. 8, 96 S.Ct. at 1566 & n. 8 (Brennan, Marshall, JJ., concurring in part and dissenting in part) (and citations therein). Inasmuch as this is not a subsequent criminal proceeding brought by the State of New Hampshire, but is instead a civil action brought by plaintiff, his prior statement to Investigator Carlson is not subject to *Miranda* and is properly admissible as being an admission by a party-opponent. *See* Fed.R.Evid. 801(d)(2)(A); *United States v. Rios Ruiz,* 579 F.2d 670, 675–77 (1st Cir.1978).

ny at trial: that he failed to file a complaint because he did not feel the incident was that important.

In contrast, defendants presented the testimony of six witnesses, five of whom had previously given statements consistent with their later testimony on the stand. All of their statements were consistent with each other and clear on the point that minimal force was applied.[6] (Defendants' Exhibit B.) Plaintiff admits that he resisted Grimaldi's order to submit to handcuffing. Statement of Gerard Bean, *supra*, at 2, 3. Plaintiff was seen by medical personnel within twenty minutes of his arrival at SHU, and the next day, and on several occasions in the following weeks; the reports and testimony generated by medical personnel concerning the examinations uniformly belie that plaintiff suffered extensive injury in the altercation or that excessive force was used against him. In essence, the Court finds that the force applied by correctional officers during the sallyport altercation was reasonably necessary at the time in order to restore discipline, and that plaintiff has failed to show that such force as was applied was done in a malicious or sadistic manner. Accordingly, plaintiff's Eighth Amendment claim that excessive force was used against him is denied.

*The Eighth Amendment Inadequate Treatment Claim*

■ Plaintiff asserts that he received inadequate medical care following the sallyport incident and that such inadequate treatment constitutes "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925,

49 L.Ed.2d 859 (1976) (plurality opinion of Stewart, Powell, and Stevens, JJ.)). Recognizing that "imprisonment carries with it the circumscription or loss of many significant rights," *Hudson v. Palmer*, 468 U.S. 517, 524, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984); *United States v. Chamorro*, 687 F.2d 1, 3 (1st Cir.), *cert. denied*, 459 U.S. 1043, 103 S.Ct. 462, 74 L.Ed.2d 613 (1982), and that "[t]o the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society," *Rhodes v. Chapman*, *supra*, 452 U.S. at 347, 101 S.Ct. at 2399, the Supreme Court has limited the Eighth Amendment's prohibition of "the unnecessary and wanton infliction of pain" with regard to providing medical care in a prison setting. Where an alleged failure to respond to a medical request is at issue, Eighth Amendment protection is violated only by a prison official's *"deliberate indifference* to [a prisoner's] *serious* medical needs." *Estelle, supra,* 429 U.S. at 106, 97 S.Ct. at 292 (emphasis added). In the instant case, proof of such deliberate indifference to serious need is not supported by a preponderance of the evidence.

Within thirty minutes of his arrival at SHU, plaintiff was examined by NHSP Physician Assistant George Carlucci to address plaintiff's complaints of a dislocated left shoulder and rib pain. In his subsequent report of this examination, Carlucci noted that plaintiff's responses were inappropriate to his complaints; nonetheless, Carlucci ordered that x-rays be taken. Plaintiff's x-rays, taken the following day, showed no evidence of injury.

Plaintiff was also seen by NHSP Nurse Jayne Smith on at least one occasion be-

---

**6.** Plaintiff argues forcefully that defendants' eyewitness reports of the sallyport altercation are flawed because they differ in small details—the precise words which were spoken, and who fell on whom and in what order when the participants fell struggling to the floor. The Court takes notice, as it did at trial, that when a tumultuous event of short duration occurs, eyewitness accounts of contemporaneous details are often perceived and related differently. It

would be more cause for concern if the six accounts were mirror images of each other. *See* Note, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification*, 29 Stan.L.Rev. 969 (1977) (discussion of various studies showing inherent unreliability of human perception and memory, particularly when observer is faced with events which provoke fear or anxiety or are of short duration).

tween May 30 and June 5. Based on Smith's examination of plaintiff's outward signs and based on the x-ray report, the negative results of which had been telephoned to NHSP after being read by a radiologist, Smith determined that emergency treatment was unnecessary. Smith did recommend, however, that plaintiff be seen at an early opportunity by Dr. Edythe Craig, an osteopathic physician working three days per week at NHSP.

Dr. Craig examined plaintiff on June 5, and again on June 19. She determined that surgery was inappropriate, but prescribed Feldene, an anti-inflammatory medication, and requested that plaintiff be seen by Dr. Leo Klinger to further investigate plaintiff's continuing complaints of shoulder problems and numbness in his left hand. Dr. Klinger, a family physician of thirty-one years' experience who acted as an outside consultant to NHSP and who had previously examined plaintiff on at least four occasions, examined plaintiff on June 27. According to Dr. Klinger's post-examination report and trial testimony, he found no immediate medical problems except some slight atrophy in plaintiff's left shoulder muscles which Dr. Klinger attributed to plaintiff's insistence on wearing a sling. Dr. Klinger recommended an exercise program to strengthen the weakened muscles.[7] Plaintiff was further examined by Dr. Craig on July 10 and July 17. Dr. Craig found no additional problems, but prescribed Robaxin, a muscle relaxant.

Viewing the evidence in its entirety, the Court finds that plaintiff has failed to carry his burden of proof. He has not shown by a preponderance of the evidence either that he was afflicted by serious illness or that defendants exhibited deliberate indifference to serious medical needs. When defendants received notice of plaintiff's complaint, they acted appropriately and expeditiously by having plaintiff examined by competent medical personnel. Accordingly, plaintiff's Eighth Amendment claim alleging inadequate medical treatment is denied.

### The Due Process Deprivation of Property Claim

■ Plaintiff alleges that defendants lost two of his estimated forty folders of legal papers during the course of transferring his property to him at SHU. Plaintiff contends that this loss deprived him of his property without due process of law in violation of his rights under the Fourteenth Amendment.

In a recent case involving a § 1983 prisoner due process claim against a prison official, Chief Justice Rehnquist (then Justice Rehnquist), writing for the majority of the Court in a decision with no dissenting opinions, stated: "We conclude that the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty or property." *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986) (emphasis in original). Plaintiff admitted at trial that the two missing folders might have been accidentally lost, and explicitly stated he was *not* alleging that Property Officer Lawson intentionally caused the loss of the folders. Furthermore, plaintiff produced no evidence that any other NHSP employee intentionally caused his loss.

Plaintiff has produced no evidence to show that the loss of his property was intentional;[8] accordingly, his claim must be denied.

### The Due Process Restricted Access to the Courts Claim

■ Pursuant to NHSP regulations, Property Officer Lawson withheld approxi-

---

**7.** Dr. Klinger had also examined plaintiff in 1984 for problems concerning weakness in his left shoulder and had prescribed a similar exercise program. Dr. Klinger noted at trial that 1984 follow-up visits indicated that plaintiff had failed to follow exercise recommendations.

**8.** The *Daniels* decision leaves open the question of whether recklessness or gross negligence—something more than ordinary negligence, but less than intentional conduct—will trigger Due Process Clause protection. *Daniels, supra,* 106 S.Ct. at 667 n. 3. However, as plaintiff has alleged neither recklessness nor gross negligence, the Court does not consider the issue.

mately eight of plaintiff's law books from him after his transfer to SHU and instead gave the books to plaintiff's friend, Janet Roux, for safekeeping. Plaintiff asserts that Lawson's action in this regard violated plaintiff's right to due process by improperly restricting his access to the courts.

It is well-settled law that inmates have a fundamental constitutional right of access to the courts. *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977); *Carter v. Fair,* 786 F.2d 433, 435 (1st Cir.1986); *Laaman v. Perrin,* 435 F.Supp. 319, 326 (D.N.H.1977). This right requires correctional facilities "to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds, supra,* 430 U.S. at 828, 97 S.Ct. at 1498. However, "[c]ompeting with this fundamental right is the far reaching discretion afforded prison administrators in their Sisyphean task of maintaining security and order in the prison." *Laaman, supra,* 435 F.Supp. at 327; *see also Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) ("courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform"). The Supreme Court, attempting to draw a reasonable balance between the two competing concerns, has held that the Constitution does not mandate any one particular method as being the sine qua non for providing meaningful access to the courts. *See Bounds, supra,* 430 U.S. at 830–31, 97 S.Ct. at 1499. "[O]ur main concern here," the Court stated in *Bounds,* "is 'protecting the ability of an inmate to prepare a petition or complaint.'" *Id.* at 828 n. 17, 97 S.Ct. at 1498 n. 17 (quoting *Wolff v. McDonnell,* 418 U.S. 539, 576, 94 S.Ct. 2963, 2984, 41 L.Ed.2d 935 (1974)).

Plaintiff's law books were withheld from him pursuant to NHSP regulations which allow SHU residents only one book or magazine at a time unless otherwise authorized by the SHU Unit Manager. Plaintiff failed to receive prior authorization for the additional books and failed to produce evidence that he had even requested such authorization. Plaintiff admitted that NHSP had two law libraries for inmate use, one at the medium security unit and one at SHU, and produced no evidence tending to show that the books to which he was denied access were not readily available in one or both of those libraries. Finally, plaintiff produced no causal evidence supporting his contention that access to these particular law books was necessary to allow him meaningful access to the courts.

In essence, plaintiff has failed to show: (1) that the withholding of his books was unreasonable given readily available alternative legal library resources, or (2) that a causal nexus exists; that is, that access to his personal books was necessary in order for him to obtain meaningful access to the courts. Accordingly, plaintiff has failed to meet his burden of proof under *Bounds* and is hereby denied the relief he seeks.

### Conclusion

This Court fully recognizes that inmates do not forfeit all constitutional protections by reason of their confinement, but it is to be borne in mind that incarceration brings about the necessary withdrawal or limitation of many privileges and rights and that prison administrators are to be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and maintain institutional security. *United States v. Chamorro, supra,* 687 F.2d at 2–3 (and cases cited therein). Within the context of constitutional law as applied to prisons, I find and rule that plaintiff is not here entitled to the relief which he seeks.

The foregoing shall comprise the findings and rulings of this Court pursuant to Rule 52(a), Fed.R.Civ.P. Any requests for findings and rulings which are not hereinabove inferentially granted are herewith denied.[9]

9. In the course of review of the exhibits to

which objection was made, the Court has strick-

716

The Clerk is directed to enter judgment for the defendants herein without further delay. As I find and rule that the claims advanced were neither frivolous nor brought for the purposes of harassment, each party shall bear its own fees and costs.

SO ORDERED.

en the identification from Defendants' Exhibit B. *See supra* note 5. The manner in which the issues in this litigation have been resolved has made it unnecessary for the Court to further consider Plaintiff's Exhibits 1 and 16, and they remain marked for identification.