Ulmann v. Merr. Cty. HOC          CV-02-405-JD  01/21/03

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF NEW HAMPSHIRE**

Peter Ulmann

   v.                                     Civil No. 02-405-JD
                                              Opinion No. 2003 DNH 012

Carole A. Anderson,
Superintendent, Merrimack County
House of Correction, et al.


## REPORT AND RECOMMENDATION


Before the Court is the amended complaint (document no. 9) of *pro se* plaintiff Peter Ulmann, who has filed suit against Carole A. Anderson, the Superintendent of the Merrimack County House of Correction ("MCHC"), Captain Craft, the MCHC Chief of Security, and Henry Simons, a physician's assistant at the MCHC, pursuant to 42 U.S.C. § 1983. Ulmann alleges violations of his constitutional and statutory rights resulting from denial of certain religious items, denial of an adequate kosher diet, the use of religious and ethnic slurs against him, denial of visits from the Israeli consulate, denial of phone contact with his family, hazardous conditions of confinement, and denial of adequate medical care during his incarceration at the MCHC.[1] As

---

[1]As of November 14, 2002, Ulmann has been transferred to the New Hampshire State Prison.

Ulmann is proceeding both *pro se* and *in forma pauperis*, the matter is currently before me for preliminary review. See United States District Court for the District of New Hampshire Local Rule 4.3(d)(2). As explained fully herein, in an Order issued simultaneously with this Report and Recommendation, I direct Ulmann's religious items and diet claims, Religious Land Use and Institutionalized Persons Act ("RLUIPA") claim, inadequate nutrition claim, consular visitation claim and family association claim to be served on defendants Anderson and Craft. I recommend that the equal protection claim, the medical care claim and the hazardous conditions claim, as well as defendant Simons be dismissed from this action, as the complaint does not allege sufficient facts to state a claim upon which relief might be granted as to those claims and that defendant.

<u>Standard of Review</u>

In reviewing a *pro se* complaint, the court is obliged to construe the pleading liberally. See <u>Ayala Serrano v. Lebron Gonzales</u>, 909 F.2d 8, 15 (1st Cir. 1990) (following <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976) to construe *pro se* pleadings liberally in favor of the *pro se* party). At this preliminary stage of review, all factual assertions made by the plaintiff and

2

inferences reasonably drawn therefrom must be accepted as true. See Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996) (stating the "failure to state a claim" standard of review and explaining that all "well-pleaded factual averments," not bald assertions, must be accepted as true). This review ensures that *pro se* pleadings are given fair and meaningful consideration. See Eveland v. Dir. of C.I.A., 843 F.2d 46, 49 (1st Cir. 1988).

<u>Discussion</u>

1. <u>Claims Regarding Denial of Religious Items</u>

Ulmann attempts to state causes of action under the First Amendment and the RLUIPA for an alleged deprivation of the use of a teffilin at the MCHC. I will address each cause of action in turn, after summarizing the facts alleged which give rise to those claims.

A. <u>Denial of Teffilin</u>

Ulmann alleges that he is an orthodox jew, and that part of the practice of his religion requires that he wear teffilin every day in order to pray. Teffilin are small black boxes that adult orthodox Jewish men tie onto their head and arm daily while they pray, except on shabbat and holy days. Ulmann asserts that wearing teffilin is an essential part of his religious practice.

3

Ulmann asserts that he has worn teffilin as part of his daily prayer ritual for more than forty years. Rabbi Shmuel Spritzer of Brooklyn, New York, provided a letter to MCHC on Ulmann's behalf verifying Ulmann's claim of a need to use teffilin as part of his prayer ritual. Nevertheless, Anderson denied Ulmann permission to use teffilin.

B.   Free Exercise Claim

Ulmann alleges in his complaint that the defendants denied him his right to freely exercise his religion as guaranteed by the First and Fourteenth Amendments to the United States Constitution. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285 (1948). However, a prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974); see also, Bell v. Wolfish, 441 U.S. 520, 545 (1979) ("prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison."). The retained rights include the right

4

to the free exercise of religion.  <u>Cruz v. Beto</u>, 405 U.S. 319, 322 (1972).  "A prisoner has the right to participate in practices which are an integral part of his religious belief." <u>Moorish Sci. Temple of Am. v. Smith</u>, 693 F.2d 987, 990 (2d Cir. 1982); <u>see</u> <u>also</u> <u>Barnett v. Comm'r, N.H. Dept. of Corr.</u>, No. Civ. 98-305-JD, 2000 WL 1499490 (D.N.H. Apr. 26, 2000).  Prisons must provide all inmates reasonable opportunities to exercise their religious freedom.  <u>Cruz</u>, 405 U.S. at 322, n.2.

The Supreme Court has held that a prisoner's sincerely held religious beliefs must yield if contrary to prison regulations that are "reasonably related to legitimate penological interests."  <u>Turner v. Safely</u>, 482 U.S. 78, 89 (1987); <u>see also</u>, <u>Washington v. Harper</u>, 494 U.S. 210, 224 (1990) (prison restrictions that implicate constitutional rights are judged by the reasonableness standard); <u>O'Lone v. Shabazz</u>, 482 U.S. 342, 351-352 (1987) (the Constitution does not require the prison to sacrifice legitimate penological objectives to satisfy an inmate's desire to exercise his religion so long as an inmate is not deprived of all forms of religious exercise).

Nothing in Ulmann's complaint suggests that the religious practice of wearing teffilin as a daily prayer ritual would

offend legitimate penological objectives.  Further, the fact that Ulmann has worn teffilin to pray daily for more than forty years, indicates that he does, in fact, hold a sincere belief in the centrality of this practice to the exercise of his religion. Additionally, Ulmann took steps to assure the MCHC of the religious significance of the practice of wearing teffilin by having that practice legitimated through correspondence with a rabbi.  For these reasons, I find that Ulmann has stated the facts necessary to state a claim upon which relief might be granted for a violation of his First and Fourteenth Amendment right to freely exercise his religion.

C.    RLUIPA Claim

Ulmann also raises the RLUIPA as a basis for relief.  42 U.S.C. § 2000cc-1 states in relevant part:

> (a) General Rule. No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>
> > (1) is in furtherance of a compelling governmental interest; and
> >
> > (2) is the least restrictive means of furthering that compelling governmental interest.

> (b) Scope of application. This section applies in
> any case in which –
>
>> (1) the substantial burden is imposed in a
>> program or activity that receives Federal
>> financial assistance;[2] or
>>
>> (2) the substantial burden affects, or removal
>> of that substantial burden would affect,
>> commerce with foreign nations, among the
>> several States, or with Indian tribes.

Thus, "RLUIPA protects prisoners and other institutionalized people from government infringement on their practice of religion." Mayweathers v. Newland, ___ F.3d ___, 2002 WL 31875409 *1 (9th Cir. Dec. 27, 2002) (upholding the constitutionality of RLUIPA). Further, under the terms of the RLUIPA, a religious exercise need not be "compelled by or central to a system of religious belief" in order to be covered by the statute. 42 U.S.C. § 2000cc-5(7)(A). Therefore, even if Ulmann had failed to state that his religious practices are essential to his religious belief, those practices may not be burdened by the government unless such a burden is the least restrictive means to achieve a compelling state interest. See Mayweathers at *2. In

---

[2]Ulmann has not specifically alleged that the MCHC is an institution receiving federal funds, obliging it to comply with the RLUIPA. For the purposes of preliminary review, I find that as Ulmann has asserted that he has rights that accrue to him under this statute, that he has adequately alleged that MCHC is an eligible institution for liability under the RLUIPA.

7

order to state a claim upon which relief might be granted based on a violation of the RLUIPA, Ulmann must only demonstrate that the "regulation in question: (1) imposes a substantial burden; (2) on the "religious exercise;" (3) of a person, institution, or assembly. Grace United Methodist Church v. City of Cheyenne, ___ F.Supp.2d ___, 2002 WL 31831443 at *7 (D.Wyo. Dec. 16, 2002), citing Murphy v. Zoning Comm'n of the Town of New Milford, 148 F.Supp.2d 173, 187 (D.Conn. 2001). I find in this case that Ulmann has sufficiently alleged that the government has burdened his religious practices in a manner not consistent with the requirements of the RLUIPA and I will direct this claim to be served on the defendants.

2. Denial of Kosher Diet Claim

As part of the practice of his religion, Ulmann adheres to a kosher diet. Ulmann claims that during his incarceration at the MCHC, he was denied a nutritious kosher diet and was instead made to eat a vegetarian diet that was "without any nutritious value," leaving him subject to "physical starvation."

Courts have recognized that prison authorities must accommodate the rights of prisoners to receive diets consistent with their religious beliefs. See Kahane v. Carlson, 527 F.2d

8

492, 495 (2d Cir. 1975). In cases of a jewish inmate requiring a religious diet, prison authorities must provide, "a diet sufficient to sustain the prisoner in good health without violating the Jewish dietary laws." Id. at 496. To the extent he has raised a claim that he is being denied the ability to freely practice his religion for reasons other than legitimate penological objectives, Ulmann has successfully stated a claim that he has been denied an adequate kosher diet in violation of his First Amendment rights and his rights under the RLUIPA to allow that claim to proceed.

To the extent that Ulmann is objecting to the adequacy of the nutritional value of the diet he was given, rather than a religiously based objection to the diet MCHC provided to him, jail officials have a duty to provide inmates with adequate food because inmates are not in a position to provide it themselves. See Giroux v. Somerset County, 178 F.3d 28, 31 (1st Cir. 1999). Further, there is no legitimate penological justification for inadequate portions of food. O'Connor v. Huard, 117 F.3d 12, 16 (1st Cir. 1997), cert. denied, 522 U.S. 1047 (1998). Therefore, by alleging he was given a diet entirely devoid of nutritional

9

value, Ulmann has stated a claim for an inadequate diet in addition to his religious diet claim.

3.  Equal Protection Claim

Ulmann claims that due to earning a reputation among MCHC personnel as a "troublemaker" he was subjected to antisemitic remarks and slurs by correctional officers.  Ulmann has not named any individual officers, but states that the slurs were made with the knowledge and approval of Anderson.  Although verbal abuse generally does not invoke constitutional protection, see Shabazz v. Cole, 69 F.Supp.2d 177, 198-201 (D.Mass. 1999) (citing authority to explain that racial slurs and verbal threats do not violate a prisoner's constitutional rights), generously construing Ulmann's allegations it appears that he may be attempting to state a claim under the Equal Protection Clause.

Although prisoners are protected against invidious discrimination by the Equal Protection Clause of the Fourteenth Amendment, see Wolff v. McDonnell, 418 U.S. 539, 556 (1974), to prevail on such a claim, the plaintiff must show that he was treated differently from similarly situated inmates because of his religious views.  See Rubinovitz v. Rogato, 60 F.3d 906, 910 (1st Cir. 1995).  Isolated instances of name-calling and verbal

10

harassment, by themselves, will not support an equal protection claim. See DeWalt v. Carter, 224 F.3d 607, 612 (7th Cir.1999). Thus, even presuming that the facts in Ulmann's complaint are true, these assertions, while describing unprofessional and reprehensible conduct on the part of the offending officers, fail to establish an Equal Protection violation.  Further, Ulmann neither alleges in his complaint, nor offers evidence to suggest, that defendants otherwise treated him differently from other similarly situated inmates as a result of his religion. Accordingly, I recommend that the equal protection and verbal harassment claims raised by Ulmann be dismissed.

4.    Denial of Consular Visit Claim

Ulmann, an Israeli citizen, states that during nine months of incarceration at the MCHC, he was only permitted one visit from the Israeli consulate in Boston, Massachusetts, and that it was conducted improperly, although Ulmann does not specify what about the visit was not in accordance with applicable law.

Any right Ulmann has to consular visitation subsequent to his arrest is cognizable under the Vienna Convention on Consular Relations ("VCCR"), April 24, 1963, 21 U.S.T. 77, 101 T.I.A.S. No. 6820, which states, in pertinent part:

11

1.  With a view to facilitating the exercise of consular functions relating to nationals of the sending state:

...

(b)  if [the defendant] so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner.  Any communication addressed to the consular post by the person arrested, in prison, custody, or detention shall also be forwarded by the said authorities without delay.  The said authorities shall inform the person concerned without delay of his rights under this subparagraph;

2.  The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.

VCCR, Art. 36; see also 28 C.F.R. § 50.5(a)(1) ("In every case in which a foreign national is arrested the arresting officer shall inform the foreign national that his counsel will be advised of his arrest unless he does not wish such notification to be given.").  Although the matter has not been decided in the First Circuit, federal courts have held that a private right of action exists under the VCCR for individual foreign nationals detained

12

by foreign officials that is cognizable under § 1983 as a claim of "violation of his right to consular notification under the VCCR." Standt v. City of New York, 153 F.Supp.2d 417, 427 (S.D.N.Y. 2001); see also Breard v. Greene, 523 U.S. 371, 376 (1998) (Vienna Convention "arguably confers on an individual the right to consular assistance following arrest."). Although Ulmann offers a dearth of specifics with regard to the denial of consular visitation, generously construing his complaint I find that he has alleged the minimum facts necessary to allow the claim to go forward at this time.

5. Denial of Phone Contact with Family Claim

Ulmann's wife and child live overseas. He says that he has not been allowed to call them because the phones ordinarily used by MCHC inmates cannot be used to place overseas collect calls. Such calls must be placed over the MCHC's business lines which, Ulmann was told, "interferes with jail business." Ulmann was twice permitted to place overseas calls to his family on an emergency basis.[3]

---

[3]Ulmann states that he has been charged for these phone calls. Although it appears that Ulmann objects to being charged for the calls, his complaint does not raise a constitutional argument against such a charge. As such, none will be considered at this time. If such a claim was intended by Ulmann, he should file an amended complaint specifying the legal and factual basis

13

Ulmann alleges that the MCHC's policy and practice of prohibiting overseas collect calls denied him his right to contact his immediate family in violation of the First Amendment and his right to intimate association. See Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1984). Although associational rights are "the most obvious of the First Amendment rights that are necessarily curtailed by confinement," see Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125 (1977), pretrial detainees have been recognized as having a First Amendment right to some telephone access. See e.g., Coronel v. Hawaii, 993 F.2d 882, 883 (9th Cir. 1993).

In discussing the analogous issue of visitational association with family members, the First Circuit has stated:

> For detainees to receive visits at regular intervals from loved ones and friends is a commonly accepted privilege; . . . and implicates, in the case of detainees especially, communicative as well as associational values protected by the first amendment. A refusal, therefore, to allow the ordinary detainee any visitation privileges or the laying down of capricious limitations not justified by considerations of jail security and order, would be unconstitutional.

Feeley v. Sampson, 570 F.2d 364, 372 (1st Cir. 1978) (citing Procunier v. Martinez, 416 U.S. 396, 411-12 (1974)). Although

for such a claim.

14

the Court in <u>Feeley</u> declined to decide definitively that a detainee maintained an absolute constitutional right to use the telephone to contact his immediate family, it acknowledged that among courts applying the appropriate standard of review to the issue "the consensus has been in favor of at least some access." <u>Id.</u> at 374 (collecting cases).

Ulmann has alleged that he was entirely denied non-emergency phone contact with his immediate family by the MCHC's failure to make it possible for him to make overseas collect calls, either by providing an inmate telephone with such a capability, or by allowing him access to the jail's business phones for such calls. As such, Ulmann has stated facts sufficient to allege a violation of his associational rights under the First Amendment by the defendants and I will allow this claim to go forward at this time.

6. <u>Denial of Adequate Medical Care Claim</u>

Ulmann states that he is diabetic, anemic, has a chronic heart problem, has only one kidney, has a high protein content in his urine, has difficulty urinating due to constant genital swelling, suffers pain in his hip and pelvis, and has constant chest pains. During nine months of incarceration, Ulmann alleges that he saw a

15

physician only once.  Instead, he was generally treated by Simons, a physician's assistant.  Despite his ailments, Ulmann claims that he has been denied diagnostic tests beyond basic laboratory testing, and has been denied proper diagnosis, treatment, and monitoring for his known and potential medical problems, resulting in undiagnosed problems, untreated pain, and inadequate evaluation by appropriate medical professionals. Ulmann does not allege any specific injury as a result of the MCHC's failure to treat him adequately.

To state a cause of action under § 1983 premised on inadequate medical care, a plaintiff must allege facts which demonstrate that the defendants acted with deliberate indifference to his serious medical needs.  Estelle, 429 U.S. at 106; Bean v. Cunningham, 650 F.Supp. 709, 713 (D.N.H. 1986).[4] Deliberate indifference may be manifested by prison medical personnel in their response to a prisoner's needs or by prison personnel "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once

_____

[4]Because Ulmann was a pretrial detainee while housed at the MCHC, the defendants' constitutional obligation to provide him with adequate medical care flows from the Fourteenth Amendment's due process clause, rather than the Eighth Amendment's prohibition against cruel and unusual punishment.  Bell v. Wolfish, 441 U.S. 520, 555 (1979).

16

prescribed." Estelle, 429 U.S. at 104-05. As to the second essential element, "[a] medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Gaudreault v. Salem, 923 F.2d 203, 208 (1st Cir. 1990). Deprivation of medical care constitutes cruel and unusual punishment under the Eighth Amendment only if the indifference to an inmate's medical needs was reckless or wanton in the criminal law sense, not merely negligent. See Watson v. Canton, 984 F.2d 537, 540 (1st Cir. 1993). In order to allege that the MCHC has failed to provide him with constitutionally adequate medical care, therefore, Ulmann must allege a "deliberate indifference" to his serious medical needs. See Consolo v. George, 58 F.3d 791, 793-95 (1st Cir. 1995) (explaining how the "deliberate indifference" to serious medical needs standard for an Eighth Amendment violation applies to pretrial detainees even though they are protected by the due process clause of the Fourteenth Amendment); Elliott v. Cheshire County, 940 F.2d 7, 10 (1st Cir. 1991) ("It is clearly established . . . that 'jail officials violate the due process rights of their detainees if they exhibit a deliberate

17

indifference to the medical needs of the detainees that is tantamount to an intent to punish.'") (citations omitted)).

Here, Ulmann has not described either the requisite seriousness of the deprivation or the requisite "deliberate indifference" on the part of any prison official. It is clear that Ulmann is unsatisfied with the care he received from the MCHC medical staff, but he has not offered any evidence that the care he received or did not receive was the result of deliberate indifference to his health or safety or any serious medical need. Ulmann has not alleged any injury suffered as a result of the inadequacies he perceives in the medical care he received. Importantly, Ulmann has not alleged that he did not receive care or medical attention for his ailments, only that he was dissatisfied with the type and degree of treatment he received at the MCHC. Accordingly, I recommend this claim be dismissed without prejudice to Ulmann's ability to renew the claim should he be able to allege additional facts indicating that he has been injured by the MCHC's inadequate medical care.

7. Hazardous Conditions Claim

Ulmann states that up until three months prior to the filing of his complaint, the MCHC was a reasonably safe institution.

18

Three months prior to his September 2002 filing, however, the conditions at the MCHC changed as a result of MCHC employee apathy. Ulmann alleges that the jail was controlled by a few tough inmates and those who took instructions from them. He further alleges that the guards, as a result of their own job dissatisfaction, ceased to pay attention to what occurred in the jail and tolerated fights and other violence. Ulmann alleges that as a result of the lack of attention to their duties, the MCHC employees placed older and infirm inmates like Ulmann in a situation where their lives were in danger, and they suffered from intimidation by and fear of other inmates. Ulmann does not allege that any specific harm came to him as a result of this degeneration in prison conditions.

To state a constitutional prison conditions violation, Ulmann must demonstrate that he was subjected to a deprivation that was objectively "sufficiently serious," and that the official who caused the deprivation was "deliberately indifferent" to his needs. See Wilson v. Seiter, 501 U.S. 294, 298, 303 (1991); Giroux, 178 F.3d at 32. A challenged condition of housing may be objectively "sufficiently serious" standing alone or in combination with other conditions, if it deprives the

19

inmate of an identifiable, human need. See Wilson, 501 U.S. at 304. A prison official is "deliberately indifferent" if he is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and also draws the inference." See Farmer v. Brennan, 511 U.S. 825, 836-37 (1994). Thus, an Eighth Amendment claim arises only if an official inflicts "cruel and unusual punishment" by knowing of and disregarding "an excessive risk to inmate health or safety." Id. at 837, 838; Giroux, 178 F.3d at 32 (explaining how the official must have "an actual, subjective appreciation of risk").

That Ulmann was afraid of younger stronger inmates in a jail setting where those charged with his protection appeared to be apathetic to their duties, without more, does not demonstrate that MCHC officials were aware of and deliberately indifferent to a serious risk to Ulmann's safety. See Street v. Fair, 918 F.2d 269, 271-72 (1st Cir. 1990) (finding no Eighth Amendment claim where plaintiff complained generally of being afraid after a threat with no injury). Ulmann has not cited any specific facts or described any specific circumstances which would have given rise to a particularized duty of the corrections officials at the MCHC to act.

20

Accordingly, nothing in the facts alleged by Ulmann demonstrates either an objectively serious deprivation or a subjective awareness of the risk to his health or safety on the part of any defendant. I find, therefore, that Ulmann has failed to state a claim upon which relief may be granted under § 1983 for being housed in an intimidating atmosphere during of his confinement at the MCHC.

8. Choice of Defendants

    A. Supervisory Liability

Ulmann has named MCHC Superintendent Carole Anderson and MCHC Chief of Security Capt. Craft as defendants to this suit. Because he alleges few facts describing either Anderson's or Craft's involvement in the incidents alleged, I assume that Ulmann intends to sue them in their supervisory capacities. "Supervisory liability under § 1983 cannot be predicated on a *respondeat* theory, but only on the basis of the supervisor's own acts or omissions." Matos v. Toledo Davila, 135 F.3d 182, 192 (1st Cir. 1998). A supervisor must be "either a primary actor involved in, or a prime mover behind, the underlying violation." Camilo-Robles v. Zapata, 175 F.3d 41, 43-44 (1999). There must be "an affirmative link, whether through direct participation or

21

through conduct that amounts to condonation or tacit authorization" to the violation alleged. Id. at 44. Here, Ulmann's claims suffice to allege that the religious items, diet, consular visitation and phone claims he makes were committed pursuant to MCHC policy for the treatment of inmates and with regard to policy created ostensibly for the security of the institution and, in some instances, by the specific authorization of Anderson. I find that this complaint states enough to allege that, for purposes of preliminary review, Anderson and Craft are aware of the incidents involving religious items, diet, consular visitation and phone use, and have refused to correct it. Such an allegation could amount to either explicit or tacit condonation of such circumstances, and I find therefore that Ulmann has sufficiently stated a claim against both Anderson and Craft in their supervisory capacities to allow this action to proceed against them.

B. Henry Simons

Henry Simons is the physician's assistant who treated Ulmann during his stay at the MCHC. The only claim raised by Ulmann involving Simons is the inadequate medical care claim. Because I

recommend dismissal of that claim, I also recommend dismissal of Simons from this action.

Conclusion

For the reasons explained herein, I recommend dismissal of the equal protection, medical care and generally hazardous conditions of confinement claims, as well as defendant Simons from this action. In an Order issued simultaneously with this Report and Recommendation, I allow the free exercise of religion (involving teffilin and kosher diet), RLUIPA, inadequate food, consular visitation, and phone association with family claims to be served on defendants Anderson and Craft. See 28 U.S.C. § 1915A(b)(1).

If this recommendation is approved, the claims as identified in this Report and Recommendation, will be considered for all purposes to be the claims raised in the complaint. If the plaintiff disagrees with the identification of the claims herein, he must do so by objection filed within ten (10) days of receipt of this Report and Recommendation, or he must properly move to amend the complaint.

Any objections to this Report and Recommendation must be filed within ten (10) days of receipt of this notice. Failure to

file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).


_____
James R. Muirhead
United States Magistrate Judge

Date:    January 21, 2003

cc:      Peter Ulmann, *pro se*

24