Ulmann v. Merrimack HOC                    CV-02-405-JD  04/26/04

UNITED STATES DISTRICT COURT FOR THE
                     DISTRICT OF NEW HAMPSHIRE


Peter Ulmann

       v.                             Civil No. 02-405-JD
                                      Opinion No. 2004 DNH 073
Carole A. Anderson, Superintendent,
Merrimack County House of
Corrections, et al.


                         O R D E R


     While incarcerated at the Merrimack County House of

Corrections (the "MCHC") awaiting trial, Peter Ulmann filed a pro

se complaint against Carole Anderson, the superintendent of the

facility, and Jeffrey Croft, its chief of security.[1]  The

defendants have moved for summary judgment on Ulmann's claims on

a number of grounds.  Ulmann objects.


                        Background

     The following relevant undisputed facts appear in Anderson's

affidavit and the documents submitted with the parties' summary

judgment motions.[2]  Ulmann was first booked into the MCHC on

_____

     [1]Ulmann's complaint identified Croft as "Captain Craft" and
named Henry Simons, a physician's assistant who treated Ulmann at
the MCHC, as an additional defendant.  Simons was dismissed from
the case as recommended by the magistrate.  See infra.

     [2]Neither party's summary judgment brief complies with L.R.
7.2(b)'s mandate that it "incorporate a short and concise
statement of material facts."  Instead, both Ulmann's and the

December 14, 2001, after being arrested on charges arising out of his alleged theft of diamonds from a jewelry store in Concord, New Hampshire, and a charge of being a fugitive from justice in Nevada. A report of Ulmann's medical condition prepared the next day indicates that he had previously been prescribed a number of medications to treat his Type II diabetes and hypotension. On December 19, 2001, Ulmann underwent a physical examination and medical history survey where he mentioned that he had only one kidney. He also related that he had been treated and released for complaints of chest pain at Concord Hospital on the day he was arrested. In response to similar complaints by Ulmann throughout January, 2002, Simons recommended on January 31, 2002,

---

defendants' briefs go directly to arguing their positions, referring to certain facts as they pertain to each section of argument, rather than following the more customary (and helpful) format of prefacing argument with an organized statement of all the underlying facts of the case. Anderson's affidavit is not an effective substitute for a Rule 7.2(b) statement, as it consists of fifty-eight numbered paragraphs taking up twenty-five single-spaced pages replete with parenthetical phrases and sentences of Joycean length, as well as two whole pages which pertain to a different inmate altogether. Nevertheless, because the facts on which each brief relies are supported by record citations, if only minimally, the court has taken upon itself the task of organizing the largely undisputed facts into one coherent statement. Furthermore, the defendants' motion to submit its exhibits on a CD-ROM (document no. 46) is allowed without objection. The court notes, however, that submitting only relevant documents, rather than every single scrap of paper produced to Ulmann in discovery, would have been more helpful.

2

that Ulmann receive a stress test.[3]  The results of the test, performed on February 5, 2002, by a cardiologist outside the prison, were "unremarkable."

Ulmann claims in his amended complaint that he "suffered what he believed to be a heart attack" in February 2002, three days before receiving an electrocardiogram test ("EKG") and chest x-ray.  His medical records, however, show that Ulmann actually underwent the EKG and x-ray on January 24, 2002, the same day on which prison medical staff saw him twice for complaints of pain and numbness in his left side and arm and difficulty breathing.  The results of the x-ray and the EKG were negative.  Ulmann neither sought nor received medical attention three days before receiving the EKG and x-ray and, at that point, had not requested medical care since January 3, 2002.[4]

Shortly after arriving at the MCHC, Ulmann received permission to make a five-minute call to his family in Singapore on a weekly basis from a staff telephone.  Although this privilege was briefly suspended in late March 2002, due to a

---

[3]Ulmann was seen by prison medical staff for reports of chest pain or dizziness on ten occasions between January 4, 2002, and February 4, 2002.  He was prescribed a number of medications during that period.

[4]Although Ulmann was not seen until the next day, January 4, 2002, the defendants explain that the delay resulted from their initial unawareness of Ulmann's request, which he made through a note left among shaving materials returned to a guard.

3

clarification of jail policy, Anderson nevertheless allowed Ulmann to make nine overseas calls between April 16, 2002, and July 7, 2002. She later discovered, however, that Ulmann had not charged a number of calls he made during that period to his calling card, but had dialed them direct, causing the MCHC to incur $273.68 in long distance charges. In a July 23, 2002, letter to Anderson, Ulmann admitted to making some of these calls, explaining that his "prepaid calling card did not function and the c.o. assisting dialed the number direct."[5] He also asked to charge another call to his wife to the MCHC so he could obtain a number where he could call her collect. Anderson responded that Ulmann would be allowed to make calling-card calls to Singapore again after receiving funds from his family to pay the long distance charges, which he had promised to do in his July 23, 2002, letter. Ulmann never did so, however.

Ulmann, who asserts that he is an Israeli citizen,[6] was permitted to visit at the MCHC with two members of the Israeli consulate on August 18, 2002. He claims in his objection to

[5]This document belies Ulmann's unsupported statement in his objection that the corrections officers "stated that they did not want to go [*sic*] Plaintiff's property to get the card and they would direct dial and let the county pay for it."

[6]Ulmann's MCHC intake survey lists his nationality as American, while his book-in summary lists it as "other." For purposes of this motion, the court will assume that Ulmann is an Israeli citizen.

4

summary judgment that this visit "was obstructed" because it occurred "in a Visiting Room with everyone else and there was no privacy." Anderson later advised the MCHC staff in writing that consulate members would be meeting with Ulmann on November 6, 2002, and that "[t]hey can visit in the law library and they may close the door if they want to." The delegation, however, failed to appear for either this visit or another one which had been scheduled, with the same privileges, for December 1, 2002.

Ulmann, an observant Jew, wrote to David Hassett, the MCHC program director, on November 5, 2002, asking him to contact a local rabbi to provide Ulmann and his fellow Jewish inmates with "the candelbraw [*sic*] and the candles and the other condiments" required to celebrate the upcoming Chanukah holiday. Hassett responded in writing that candles were not allowed inside the facility but that he had nevertheless contacted the rabbi "to possibly provide other condiments" for the holiday, to be celebrated from November 29, 2002, through December 7, 2002. In a November 21, 2002, letter to Hassett, who had explained to Ulmann that candles were prohibited for safety reasons, Ulmann wrote, "I cannot see that lighting candles in the kitchen for 20 minutes for eight nights, under a Correctional Officer [*sic*] supervision is construed to be a 'security or safety problem.'"

Hassett spoke to the rabbi on December 2, 2002, telling him that inmates were permitted neither candles nor lightbulbs but

5

suggesting that he "come in to oversee [a] glass candle lighting" for Ulmann. Hassett directed that a room be set aside for this purpose after the rabbi indicated that he would visit Ulmann the next day, but the rabbi ultimately canceled his visit. On December 5, 2002, however, he delivered an electric menorah to the MCHC on Ulmann's behalf. Hassett withheld the object from Ulmann, explaining in a memorandum to him the next day that the glass lightbulbs presented a safety and security issue and that the menorah would be placed with Ulmann's secured property.

In a December 6, 2002, letter to Anderson, which she received three days later, Ulmann charged that he had not been "allowed to celebrate the Chanukah . . . under the Rabbi [*sic*] supervision." He also wrote that during his incarceration at the MCHC for nearly all of the preceding year, he "was not given even once 'kosher food' as a practicing orthodox jew should be allowed, nor was I allowed to put on the 'Teffilin'. . . that as orthodox jews we pray with six times a week." Anderson states in her affidavit that Ulmann had never raised these issues previously. Ulmann responds in his objection that he made "written requests/grievances, etc." with respect to requiring a kosher diet but that these documents have been lost by the defendants. In a letter of March 12, 2002, submitted by the defendants, Ulmann requested a vegetarian diet both for health reasons and because "[e]ating ham and pork is offensive to me and

6

my religion" but did not reference a kosher diet.

Ulmann's objection also refers to a series of letters to him from a rabbi in Brooklyn, New York. One of those, dated May 23, 2002, encourages Ulmann "not [to] give up on kosher food. It is the right of every Jewish prisoner . . . ." Another, dated September 12, 2002, recounts that its writer spoke to the Manchester rabbi, "ask[ing] him about Tefillin, and he told me that this is not allowed," presumably in the MCHC.

On December 18, 2002, Ulmann was discharged from the MCHC to begin serving a sentence at the New Hampshire State Prison. He commenced this action on September 4, 2003, seeking damages and equitable relief in the form of a transfer. Following initial screening of the complaint pursuant to 28 U.S.C. § 1915A, the magistrate recommended that Ulmann be allowed to proceed on his claims that the defendants had violated his rights to (1) free exercise of religion, (2) adequate food, (3) consular visitation under the Vienna Convention on Consular Relations, (4) familial relations, and (5) adequate medical care.[7] 2003 DNH 12, 2003 WL 168653 (D.N.H. Jan. 21, 2003). The court adopted the recommendation over Ulmann's objection.

---

[7]The magistrate initially dismissed Ulmann's claim arising out of the alleged denial of adequate medical care without prejudice to his ability to renew it by alleging "additional facts indicating that he has been injured by the MCHC's inadequate medical care." Ulmann responded by moving to amend his complaint to allege such facts, which was allowed.

7

## Standard of Review

The court may grant a motion for summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of establishing the lack of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The court must view the entire record in the light most favorable to the plaintiff, "'indulging all reasonable inferences in that party's favor.'" Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)).

## Discussion

"[P]retrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that . . . are enjoyed by convicted prisoners." Bell v. Wolfish, 441 U.S. 520, 545 (1979); see also Riggins v. Nevada, 504 U.S. 127, 135 (1992); Roberts v. Rhode Island, 239 F.3d 107, 109 (1st Cir. 2001). Nevertheless, "[t]he fact of confinement as well as the

8

legitimate goals and policies of the penal institution limits these retained constitutional rights." Bell, 441 U.S. at 546. To define these limits, the court must evaluate the challenged practice in the light of the central objective of prison administration, safeguarding institutional security. Id. "This evaluation is a deferential one, giving due regard to the professional expertise of corrections officials and the limited role of the judiciary in operating and overseeing correctional facilities." Roberts, 239 F.3d at 110 (internal quotation marks and citations to Bell omitted).

Ulmann's complaint charges that the defendants violated a number of his constitutional rights during his incarceration at the MCHC. The defendants seek summary judgment against these claims on a two-tiered theory. Because their motion is subtitled "Qualified Immunity," however, Ulmann explains that he has "argue[d] his objection on that theory only," and purportedly "reserves his right to expand [his] objection based upon the [c]ourt's determination" that the defendants have sought summary judgment on additional grounds.

Notwithstanding the title of the defendants' motion, the body of the document expressly states that they are moving for summary judgment "based on the principles of qualified immunity and the plaintiff's inability to further prosecute this action,

9

based on bare allegations" (emphasis added).  Indeed, Ulmann himself quotes this passage on the first page of his objection, and both he and the defendants devote the vast majority of their briefing to the argument that Ulmann lacks evidence to support his claims, rather than to the qualified immunity defense.[8]  The defendants' moving papers were therefore sufficient to (and in fact did) put Ulmann on notice that they were seeking summary judgment not only on qualified immunity grounds, but also because Ulmann could not come forward with any affirmative evidence of his claims.  See Berkovitz v. Home Box Office, Inc., 89 F.3d 24, 29-30 (1st Cir. 1996) (deciding summary judgment motion requires opposing party to have "appropriate notice and a chance to present its evidence on the essential elements of the claim or defense"); cf. Fed. Refinance Co. v. Klock, 352 F.3d 16, 32 (1st Cir. 2003).  Accordingly, the court will consider both theories of summary judgment addressed by the parties to the extent necessary to resolve the summary judgment motion.

---

[8]The court notes that the defendants' brief actually contains only nominal discussion of the qualified immunity argument and therefore provides virtually no assistance in resolving that issue.  Counsel has an obligation to present sufficiently detailed legal and factual bases for any argument that is urged upon the court.

10

I.   Alleged Denial of Adequate Medical Care

The Supreme Court has held that the rights of a pretrial
detainee to adequate medical care under the due process clause
are at least as great as the Eighth Amendment protections
available to a convicted prisoner.  City of Revere v. Mass. Gen.
Hosp., 463 U.S. 239, 244 (1983).  Accordingly, "jail officials
violate the due process rights of their detainees if they exhibit
a deliberate indifference to the medical needs of the detainees
that is tantamount to an intent to punish."  Elliott v. Cheshire
County, 940 F.2d 7, 10 (1st Cir. 1991) (internal quotation marks
omitted); see also Mahan v. Plymouth County House of Corrs., 64
F.3d 14, 17 (1st Cir. 1995).

Ulmann argues that the defendants showed a deliberate
indifference to his medical needs primarily by doing "absolutely
nothing" as he suffered a heart attack in February, 2002, despite
his complaints of chest pain.[9]  He does not allege any instance,

_____

[9]Ulmann's support for his claim that he actually suffered a
heart attack while at the MCHC consists of statements allegedly
made to him by two physicians who treated him in 2003, as
represented in his brief, and a medical record generated around
that time stating that Ulmann reported having been told that he
"quite possibly" had a heart attack in February 2002.  Such
unauthenticated, multiple-hearsay statements do not constitute
acceptable evidence for summary judgment purposes.  See Fed. R.
Civ. P. 56(c).  Nevertheless, the court will assume in deciding
this motion that Ulmann suffered a heart attack in February 2002,
as he says.

11

however, when the defendants failed to respond to either his requests for medical attention or other indications that he was having heart trouble.  To the contrary, around the time at which Ulmann claims to have had a heart attack, he had repeatedly received treatment for chest pains from staff at both the MCHC and Concord Hospital, including tests which showed no signs of abnormal cardiac activity.

"In order to be found 'deliberately indifferent,' prison officials must be shown to have been subjectively aware of a condition requiring their intervention."  Mahan, 64 F.3d at 18 (citing Farmer v. Brennan, 511 U.S. 825, 847 (1994)).  The record contains no evidence that the defendants knew Ulmann had suffered a heart attack in or around February 2002, or that they even could have known that he did, given that repeated medical examinations during that period failed to demonstrate such a condition.  Accordingly, Ulmann has not provided any support for his theory that the defendants manifested a deliberate indifference to his medical needs by failing to prevent or respond to his alleged heart attack.  See Mahan, 64 F.3d at 18 (affirming summary judgment for prison on inadequate medical care claim arising out of anxiety attacks in absence of evidence that prison "personnel were informed, or otherwise learned, of the serious symptoms [plaintiff] actually experienced while detained,

12

such as would have made them subjectively aware of a condition requiring their intervention"); Bean v. Cunningham, 650 F. Supp. 709, 714 (D.N.H. 1986) (denying prisoner's claim of inadequate medical care because "[w]hen defendants received notice of plaintiff's complaint, they acted appropriately and expeditiously by having plaintiff examined by competent medical personnel").

In his amended complaint, Ulmann also alleges that the defendants "refused to give [him] any type of dietary consideration" for both his kidney condition and his diabetes. Although his objection fails to expand upon these allegations, the court has nevertheless reviewed the medical records submitted with Anderson's affidavit and concludes that the MCHC's handling of his diabetes and prostate and kidney problems was appropriate.[10] The defendants are therefore entitled to summary judgment on Ulmann's claim for allegedly inadequate medical care.

---

[10]The records show that after Ulmann complained of difficulty urinating on May 3, 2002, and November 20, 2002, he was promptly seen for these complaints by MCHC medical staff and urine specimens were taken. He also submitted a grievance on August 12, 2002, "speculating" that he might have prostate problems and other infirmities but was seen by Simons that same night. According to Anderson's unrebutted affidavit, Ulmann was placed on a diabetic diet on January 1, 2002, less than two weeks after his incarceration at the MCHC began. His blood sugar was tested three times each week.

II.  Alleged Denial of Telephone Contact With Family

A pretrial detainee's use of the telephone may be subjected to limitations which "reasonably reflect[] legitimate apprehensions about the security and order" of the institution where he or she is detained.  Feeley v. Sampson, 570 F.2d 364, 373 (1st Cir. 1978); accord Martin v. Tyson, 845 F.2d 1451, 1458 (7th Cir. 1988); Strandberg v. City of Helena, 791 F.2d 744, 747 (9th Cir. 1986).  Although Ulmann suggests in his objection that he "did not have an opportunity" at the MCHC to make collect calls to his family, he has not submitted any evidence to controvert the statement in Anderson's affidavit that she has always allowed inmates to make collect calls from the day rooms while outside of their cells.  Instead, he complains that the defendants would not allow him to make calling-card calls.

Courts have repeatedly held that the "use of a collect-only phone system by a prison or county jail is reasonable if it does not unduly limit access to counsel or the courts."  Demits v. Tuso, 1996 WL 33972, at *2 (N.D. Cal. Jan. 17, 1996); see also Clark v. Plummer, 1995 WL 317015, at *1 (N.D. Cal. May 18, 1995); Allen v. Josephine County, 1993 WL 11948, at *6 (D. Or. Jan. 13, 1993); Lane v. Hutcheson, 794 F. Supp. 877, 881 (E.D. Mo. 1992).  The defendants therefore did not violate Ulmann's rights by limiting him to collect calls.  Indeed, the uncontradicted

14

evidence demonstrates that they extended him the privilege of charging calls to his calling card until they discovered that he had cost them $273 in long-distance charges by dialing directly instead, and even then offered to reinstate the privilege once Ulmann reimbursed them. The defendants are entitled to summary judgment on Ulmann's claim that they denied him access to his family over the telephone.

III. Alleged Denial of Consular Visitation

Ulmann alleges that the defendants "denied him proper [c]onsular visitation from the Israeli consulate" in that he was "allowed [only] one visit in . . . nine months and even that was not conducted in the manner that is allowed by law." The magistrate recommended that this claim be allowed on the basis of the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 595 U.N.T.S. 261 (the "VCCR"). In relevant part, the VCCR provides that "consular officers shall have the right to visit a national of the sending State who is in prison, custody, or detention, to converse and correspond with him and to arrange for his legal representation." Id. art. 36(1)(c).

The defendants argue at the outset that because "violations of the VCCR have no effect on due process rights, . . . there is no support for further extending it to civil damages sought in a suit brought under [s]ection 1983 . . . ." In United States v.

15

Li, 206 F.3d 56 (1st Cir. 2000) (en banc), the First Circuit considered whether the failure of American authorities to comply with Article 36 of the VCCR following the detention of Chinese nationals warranted the dismissal of indictments or the suppression of evidence against them. Id. at 59-60. Although the panel had convened to decide whether the VCCR "create[s] individual rights as to consular notification and access, that are enforceable by such individuals in court proceedings," the court declined to answer that question, deciding instead that neither the dismissal of an indictment nor the suppression of evidence would be the appropriate remedy for the violation of any such individually enforceable rights. Id. at 60.

Li, therefore, did not expressly foreclose the possibility that a foreign national can invoke the VCCR as a basis for judicial relief in this circuit. Nevertheless, its reasoning strongly suggests that the treaty cannot serve such a purpose. In fact, Judges Selya and Boudin concurred in a separate opinion in Li to point out that "essentially by drawing logical conclusions from many of the same considerations that are noted in the court's opinion," it follows that the VCCR does not confer any individual rights upon foreign nationals. Id. at 66. Other circuits have joined in this view. See United States v. Jimenez-Nava, 243 F.3d 192, 198 (5th Cir. 2001); United States v. Emuegbunam, 268 F.3d 377, 394 (6th Cir. 2001), cert. denied, 531

16

U.S. 991 (2002).

On the other hand, only one court has concluded that the VCCR furnishes a basis for judicial relief in a civil action. See Standt v. City of New York, 153 F. Supp. 2d 417, 427 (S.D.N.Y. 2001). The reasoning employed by the district court in Standt, however, conflicts with the First Circuit's analysis of the VCCR as set forth in Li. At the outset, Standt gave little weight to the presumption that international treaties do not create judicially enforceable rights in private parties, which factored heavily into the First Circuit's analysis. Compare 153 F. Supp. 2d at 422 with 206 F.3d at 61 & 66-67 (concurring opinion). The court in Standt also disagreed with the observation of the Li majority that the VCCR is "facially ambiguous on the subject of whether [it] create[s] individual rights," 206 F.3d at 62, relying instead on Judge Torruella's partially dissenting opinion in Li for the proposition that "it is difficult to imagine 'how it is possible to frame language that more unequivocally establishes that the protections of Article 36(1)(b) belong to the individual national . . . .'" 153 F. Supp. 2d at 425 (quoting 206 F.3d at 72). Finally, Standt concluded that even if the VCCR were ambiguous on the issue of individually actionable rights, "outside interpretive sources" suggested that the treaty was intended to confer such rights. Id. at 425-27. The First Circuit, in contrast, relied on similar

17

"nontextual sources" to reach the opposite conclusion.  See Li, 206 F.3d at 63-66.

This court's interpretation of the VCCR as a source of private rights is necessarily constrained by the meaning ascribed to it by the First Circuit in Li.  Although Li purported to leave that issue undecided, in this court's view the panel's reasoning leaves no room for a determination that a foreign national may seek monetary relief in a civil proceeding for a violation of his rights under the VCCR.  See Bieregu v. Ashcroft, 259 F. Supp. 2d 342, 353-54 (D.N.J. 2003) (holding that VCCR does not create duty enforceable in tort); cf. Sorensen v. City of New York, 2000 WL 1528282, at *6 (S.D.N.Y. Oct. 16, 2000) (assuming without deciding that VCCR confers private rights, but holding that treaty does not provide for money damages).  Because Article 36 of the VCCR does not bestow any rights upon Ulmann as an individual, it follows that the defendants did not violate any of his rights by allegedly denying him consular visitation.  The defendants are entitled to summary judgment on that claim.

IV.  Alleged Denial of Free Exercise of Religion

In 2000, Congress enacted the Religious Land Use and Institutionalized Persons Act (the "RLUPIA"), which provides in relevant part that

18

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . , even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>> (1) is in furtherance of a compelling governmental interest; and
>> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). The RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." Id. § 2000cc-5(7)(a). Furthermore, if the plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause, the government shall "bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the . . . practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion."[11] Id. § 2000cc-2(b).

Ulmann asserts that the defendants violated the RLUIPA by preventing him from lighting a menorah during Chanukah, using a teffilin, and adhering to a kosher diet while in custody. To survive summary judgment on this claim, Ulmann must adduce

---

[11]The defendants have filed a motion to dismiss Ulmann's RLUIPA claim on the ground that the statute is unconstitutional. The government has intervened to defend the constitutionality of the RLUIPA, filing an objection to the motion to dismiss in which Ulmann has joined. For reasons which will appear, the court need not reach the issue of the constitutionality of the RLUIPA.

evidence that these derelictions "substantially burden[ed] the exercise of religion." Id.; see also Dunlap v. Losey, 40 Fed. Appx. 41, 2002 WL 1001027, at *2 (6th Cir. May 15, 2002) (unpublished disposition). In giving meaning to the "substantial burden" test set forth by the RLUIPA, this court and others have looked to decisions interpreting the identical standard formerly imposed by the Religious Freedom Restoration Act (the "RFRA").[12] Farrow v. Stanley, 2004 DNH 29, 2004 WL 224602, at *9 (D.N.H. Feb. 5. 2004); accord Borzych v. Frank, 2004 WL 67642, at *4-*5 (W.D. Wisc. Jan. 5, 2004); Marria v. Broadus, 2003 WL 21782633, at *12 (S.D.N.Y. July 31, 2003).

This court has therefore defined "substantial burden on . . . religious exercise" under the RLUIPA as

> one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs.

Farrow, 2004 WL 67642, at *9 (quoting Charles v. Verhagen, 220 F. Supp. 2d 937, 944-45 (W.D. Wisc. 2002) (quoting Mack v. O'Leary, 80 F.3d 1175, 1179 (7th Cir. 1996) (interpreting RFRA), vacated, 522 U.S. 801 (1997)), aff'd, 348 F.3d 601 (7th Cir. 2003)).

Anderson's affidavit and its appended documentation show

_____

[12]The Supreme Court has declared the RFRA unconstitutional, at least insofar as it regulates non-federal activity. City of Boerne v. Flores, 521 U.S. 507, 531-33 (1997).

that Ulmann did not request either a kosher diet or use of a tefillin until December 6, 2002, just twelve days before his discharge from the MCHC.[13]  Ulmann attempts to dispute this fact by representing in his objection that he did ask for these accommodations in writing at some unspecified earlier time but that the defendants have since lost the documents.[14]  These bald accusations are insufficient to defeat a properly supported motion for summary judgment.  See, e.g., LeBlanc v. Salem (In re Mailman Steam Cleaning Corp.), 196 F.3d 1, 2 (1st Cir. 1999) (cautioning that, in evaluating summary judgment motion, court does "not give credence to empty rhetoric, . . . but credit[s] only those assertions that are supported by materials of evidentiary quality").  Similarly, the exhortation to Ulmann from the Brooklyn rabbi in one of his letters "not [to] give up on kosher food" and the rabbi's third-hand understanding that the MCHC did not allow use of a tefillin do not constitute proof that Ulmann actually requested either of these accommodations from the

_____

[13]Although Ulmann noted in his letter of March 12, 2002, that he objected to eating pork on religious grounds, the letter did not refer to kosher meals as such and Ulmann does not argue that the defendants continued to serve him pork after that date.

[14]Ulmann also contends that both the Manchester and Brooklyn rabbis interacted with the MCHC on his behalf to secure kosher meals.  In the absence of any affidavit from either of the rabbis or other evidence supporting this contention, however, it fails to create a factual issue.

defendants prior to his letter of December 6, 2002.[15]

It is undisputed, then, that Ulmann spent nearly a year at the MCHC without alerting the staff that his religion demanded kosher meals and a tefillin for prayer. Under these circumstances, the defendants' failure to respond to Ulmann's needs during the final twelve days of his detention at their facility did not impose a "substantial burden" on his religious exercise within the meaning of the RLUIPA. See Dunlap, 2002 WL 1001027, at *2 (holding that confiscation of prisoner's hardcover Bibles for one month, "while making the practice of his religion somewhat more difficult, did not coerce him into action contrary to his beliefs, and did not state a claim under the RLUIPA," where he failed to follow up on his initial request for softcover Bible until "a few days before his transfer"); Malik v. Kindt, 107 F.3d 21, 1997 WL 39429, at *4 (10th Cir. Feb. 3, 1997) (table) (preventing inmate from attending service for six weeks did not substantially burden religious practice under RFRA).

The defendants do not dispute that their refusal to allow Ulmann to possess a menorah due to the MCHC's prohibition on candles and glass substantially burdened his religious exercise.

---

[15]The other portions of the rabbi's letters on which Ulmann relies in his objection are irrelevant. They either refer to the rabbi's efforts to locate a tefillin among the belongings which Ulmann had apparently left with him or make no specific reference to the item whatsoever.

22

Accordingly, the court will assume without deciding that depriving Ulmann of a menorah amounts to a "substantial burden" within the meaning of the RLUIPA. The defendants do argue, however, that banning candles and glass advances a compelling governmental interest in safety and security at the MCHC and poses the least restrictive means of doing so.

As the Supreme Court recognized in Bell, "maintaining institutional security" represents one of the "essential goals that may require limitation or retraction of the retained constitutional rights of . . . pretrial detainees." 441 U.S. at 546 (footnote omitted). Lower courts have specifically determined that keeping inmates from lighting candles, despite their use in various religious rites, is a permissible means of reducing the threat of fire. See Brower v. Nuckles, 182 F.3d 916, 1999 WL 435173, at *2 (6th Cir. June 18, 1999) (table); Ward v. Walsh, 1 F.3d 873, 879 (9th Cir. 1993); Emel v. Mensinger, 1996 WL 468673, at *3 (E.D. Pa. Aug. 15, 1996). Bans on allowing prisoners to possess glass because of its potential use as an instrument of violence or suicide have also been upheld. See Munir v. Scott, 12 F.3d 213, 1993 WL 465162, at *2 (6th Cir. Nov. 10, 1993) (table); Lane, 794 F. Supp. at 883.

These cases largely had analyzed prison policies forbidding the items under the standard set forth in Turner v. Safley, 482 U.S. 78 (1987). There, the Supreme Court held that "when a

23

prison regulation impinges on an inmate's constitutional rights, [it] is valid if it is reasonably related to legitimate penological interests." Id. at 89; see also Savard v. Rhode Island, 338 F.3d 23, 30-31 (1st Cir. 2003) (en banc), cert. denied, 124 S. Ct. 1074 (2004). Under the RLUIPA, however, any substantial burden imposed on an inmate's religious exercise cannot stand unless that burden represents the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a); see also Charles, 348 F.3d at 607-608. Thus, cases decided pursuant to the standard in place prior to the RLUIPA provide limited guidance in determining the validity of keeping religious articles from inmates under the new statutory regime. See Marria, 2003 WL 21782633, at *18 n.37 (not following cases which upheld restriction on religious practice under Turner standard in applying RLUIPA analysis).

Nevertheless, based on the summary judgment record, the court concludes that there is no dispute that preventing detainees from lighting candles or possessing glass represents the least restrictive means of furthering the MCHC's compelling interest in maintaining institutional safety and security.[16]

_____

[16]Ulmann's promise in his objection "to bring in state prison personnel or others [as trial witnesses] to show that glass bulbs and candles are not a legitimate safety concern" does not create an issue of fact for summary judgment purposes.

24

Although Ulmann suggested that he be permitted to light candles in the jail cafeteria under a guard's supervision, this alternative would not have diminished the stated concern that allowing open flames in the facility presents a safety hazard. Furthermore, MCHC staff arranged for a rabbi to visit the prison during Chanukah to oversee the lighting of an electric menorah for Ulmann, but the rabbi did not show up of his own accord. Ulmann's objection does not suggest any other way to preserve safety and security at the MCHC which would have effected a lesser restriction on his religious practices.

The defendants have therefore carried their burden under the RLUIPA to show that their policy, i.e., disallowing candles and glass but nevertheless arranging for a rabbi to oversee the lighting of an electric menorah at the jail, represented the least restrictive means of maintaining safety and security at the MCHC. Ulmann has failed to come forward with any evidence to the contrary. The defendants' decision to keep Ulmann from possessing a menorah with either candles or lightbulbs did not violate the RLUIPA. See Farrow, 2004 WL 224602, at *9-*10 (ruling that, although refusal to provide sweat lodge substantially burdened inmate's practice of Native American religion, RLUIPA not violated because of "need for intensive monitoring" of proposed use of lodge); cf. Charles, 220 F. Supp. 2d at 947-52 (ruling that forbidding inmate from having prayer

oil violated RLUIPA where prison's stated security concerns were "not related to any specific difficulties presented by the possession of prayer oil," but on general problems caused by letting prisoners keep property of any kind); Marria v. Broaddus, 200 F. Supp. 2d 280, 298-99 (S.D.N.Y. 2002) (holding that banning members of particular faith from congregating or having religious literature violated RLUIPA). The defendants are therefore entitled to summary judgment on Ulmann's claim that they illegally interfered with the practice of his religion.[17]

V.    Alleged Denial of Adequate Food

Although the magistrate construed Ulmann's complaint to allege a possible claim that the defendants provided him with constitutionally inadequate food, Ulmann appears to retreat from any such claim in his objection, calling the defendants' contention that they provided him with the vegetarian diet he requested "a smokescreen for some defense theory . . . meant to cloud the kosher diet issue." He has therefore failed to support

---

[17]Because the defendants did not violate any of Ulmann's rights under the RLUIPA, they necessarily did not violate any of his rights under the free exercise clause, which provides less protection to his religious practices than the RLUIPA does. See Madison v. Riter, 355 F.3d 310, 315 n.1 (4th Cir. 2003); Mayweathers v. Newland, 314 F.3d 1062, 1070 (9th Cir. 2002), cert. denied sub nom. Alameida v. Mayweathers, 124 S. Ct. 66 (2003).

26

any claim he might have made that the defendants violated his constitutional right to adequate nutrition while incarcerated at the MCHC.[18]  Cf. Reed v. McBride, 178 F.3d 849, 853 (7th Cir. 1999) (ruling that plaintiff could proceed on constitutional claim based on allegation that defendants withheld food from him "on many occasions for three to five days at a time").  The defendants are entitled to summary judgment on Ulmann's claim, to the extent he makes one, that they denied him an adequate diet.

## Conclusion

For the foregoing reasons, the defendants are entitled to summary judgment on all of Ulmann's claims.  Accordingly, the court need not reach the defendants' claim of qualified immunity. The defendants' motion for summary judgment (document no. 44) is allowed.  The defendants' motion to submit their summary judgment exhibits by entry of a computer disk (document no. 46) has been allowed.  The defendants' motion to dismiss (document no. 31), motion for entry of late authority in support (document no. 45), and motion to extend their deadline for filing pretrial materials (document no. 58) are denied as moot.  Ulmann's motion to compel (document no. 51) and motion to extend the deadlines for

---

[18]Although Ulmann denies that the defendants provided him the vegetarian diet he requested, he points to nothing in the summary judgment record to support this assertion and offers no authority or argument for the proposition that refusing him a vegetarian diet would have violated his constitutional rights.

27

discovery and for filing pretrial materials (document no. 54) are also denied as moot.[19]  The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

April 26, 2004

cc:  John A. Curran, Esquire
     Jeffrey D. Kahn, Esquire
     Peter Ulmann, pro se

_____

[19]To the extent Ulmann's motion for a continuance seeks to compel the staff of the facility where he is currently incarcerated to allow him access to the law library, the motion is denied because the persons in charge of that facility are not before the court in this action.

28